UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

ALEXANDER WILLIAMS, JR.,

                              Plaintiff,

              -against-                                        **REPORT AND RECOMMENDATION**

CITY OF NEW YORK, et al.,                                      21-CV-1083 (PGG) (KHP)

                              Defendants.

-------------------------------------------------------X

**TO: THE HONORABLE PAUL G. GARDEPHE, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

_Pro se_ Plaintiff Alexander Williams, Jr. ("Williams" or "Plaintiff") commenced this action

seeking damages and injunctive relief under 42 U.S.C. §§ 1983, 1985, and 1986 alleging that

Defendants violated his constitutional rights while he was housed as a pre-trial detainee at the

George R. Vierno Center ("GRVC") at Rikers Island.[1]  The Court previously dismissed Plaintiff's

claims under Sections 1985 and 1986, as well as Section 1983 claims asserted against 16 of the

66 defendants named in the Second Amended Complaint ("SAC").[2]

        Plaintiff's remaining claims, contained in an extraordinarily lengthy complaint, pertain to

several different causes of action including alleged mistreatment due to his religion,

interference with access to his attorneys and the law library, unsanitary and unhealthy

conditions of confinement, improper provision of medical services, denial of substantive and

---

[1] Plaintiff twice amended his complaint.  All citations herein refer to the Second Amended Complaint ("SAC"),
which is the operative complaint.  (ECF No. 36.)  When accepting this complaint, the Court directed that no further
amendments or joinder would be permitted. (ECF No. 47.)

[2] The dismissed defendants are New York City Health & Hospital, Doctor K, Captain Ferber, CO Simms, Unknown
ESU Officer, Doctor Bryan Burns, Doctor Saidu Jimoh, Mrs. V., Shawn Fishler, Mr. Roman, ADW Lacroix, Captain
Ballah, CO Adamchez, CO Edmunds, CO Figoriua, and CO Pierce.  (ECF Nos. 60, 96.)

procedural due process in connection with being subjected to enhanced restraints, retaliation for his numerous complaints about his treatment at Rikers, and negligent hiring, retention, and supervision of the prison officers with whom he interacted.  He also contends that the City should be liable for the violations of his constitutional rights based on the prison officials' implementation of an order governing his confinement (i.e., *Monell* claim).

In light of Plaintiff's *pro se* status, the Court construes the complaint as asserting the following causes of action: (1) violations of the Board of Corrections' ("BOC") Minimum Standards; (2) violations of Plaintiff's First Amendment right to free exercise of religion and rights under the Religious Land Use and Institutionalized Persons Act of 2000, pursuant to 42 U.S.C. § 2000cc *et seq.*, ("RLUIPA") because he was not provided with a Torah for a period of time, not always provided Kosher meals, and not permitted to meet with a Rabbi for a period of time; (3) a violation of Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment insofar as a prison Command Level Order ("CLO") mandated he be given a Bible rather than allowing for a Torah; (4) violations of his Fourteenth Amendment rights related to conditions of his confinement related to hygiene and denial of recreation and medical services; (5) violations of his right to medical privacy; (6) violations of his right to meaningful access to his counsel and the courts; (7) excessive force in violation of the Fourteenth Amendment in connection with use of handcuffs/enhanced restraints; (8) violations of his substantive and procedural due process rights under the Fourteenth Amendment related to his classification as a centrally monitored case ("CMC") inmate and imposition of enhanced restraints (i.e., leg

irons, waist chains, and mitts) pursuant to a CLO issued by the prison warden;[3] (9) retaliation for bringing complaints about his conditions of confinement and lack of access to counsel and the courts in violation of the First Amendment; (10) municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); (11) negligent hiring, retention and supervision and failure to train in violation of state law; (12) false imprisonment in violation of state law in connection with being placed in restrictive housing pursuant to the Lockdown Order (as defined below); and (13) a violation of his Fifth Amendment right against self-incrimination insofar as he was forced to handwrite requests to the Law Library which allowed the state prosecutor to obtain a handwriting exemplar helpful to the prosecution in his underlying criminal case. (ECF No. 36-2, p. 15).[4] Defendants seek dismissal of the SAC in its entirety for failure to state a claim and have moved to dismiss the complaint against certain individual defendants because the SAC fails to contain sufficient allegations of their personal involvement in any deprivation of Plaintiff's rights.

For the reasons set forth below, I recommend that the motion be granted in part and denied in part.

---

[3] Plaintiff uses the term "fraud" in connection with the issuance and application of the CLO to him. The Court construes those allegations to be in the nature of due process claims addressed herein. Plaintiff also mentions the Fourth and Eleventh Amendments once (ECF No. 36-2 p. 21) but makes no factual allegations implicating rights thereunder. As such, the Court does not construe the complaint as asserting claims under these constitutional provisions.

[4] Plaintiff cites the Eighth Amendment in his SAC. However, as discussed below, the Fourteenth Amendment rather than the Eighth Amendment governs claims relating to the conditions of confinement of pretrial detainees like Plaintiff. Therefore, in light of Plaintiff's *pro se* status, the Court construes the claims as falling under the Fourteenth Amendment.

**FACTUAL ALLEGATIONS**

The following facts, taken from the SAC, are presumed true for purposes of this motion and all reasonable inferences are drawn in Plaintiff's favor.  In January 2019 while Plaintiff was awaiting trial on felony murder charges, a New York State Court judge issued a Lockdown Order directing that Plaintiff be subject to certain restrictions in prison because of his assessment that Plaintiff posed a significant risk to the safety of persons he perceived to be potential witnesses for the prosecution against him.  (ECF No. 36-7, pp 10-11.)

**1.  <u>Lockdown Order</u>**

The Lockdown Order imposed restrictions on Plaintiff's housing, visits, phone calls, and transportation – all to minimize his ability to communicate with or pass information to others who might carry out instructions to harm potential witnesses.  The Lockdown Order, stated, in pertinent part:

- The . . . defendant is to be housed in a highly secure area designated by the Department of Correction, preferably the lockdown area, on lock-in, to be separated from all other inmates in the area, in such a manner as to prevent him, to the extent possible, from communicating with or passing material to other inmates.

- Defendant is barred from having any visits other than with his attorney . . . .

- Defendant is precluded from making any telephone calls other than to his attorney. . . . A correction officer or captain shall dial such telephone number . . . using the defendant's PIN number. Moreover, the defendant's PIN number shall be changed weekly and shall not be given to the defendant.  The correction officer or captain placing the call shall verify that attorney . . . has answered the phone and, only after verifying that said attorney is on the line, shall permit the defendant in question to speak on the phone. Additionally, in order to avoid any claim by this defendant that the Department of Corrections has not permitted him to speak with his attorney in accordance with this order, the Department of

4

> Correction[s] will maintain a log of each attorney call by this
> defendant, whether completed or not, such log shall detail the
> following information for each attempted call: a) date and time call
> requested, b) time call placed, c) whether or not contact was made
> with the attorney, [d]) the time call ended.

- While in a court detention facility, this defendant will be housed in
  a similar manner [as the above].

(ECF No. 36-7, p. 10-11, SAC Ex. 19.)

The Lockdown Order was later amended to allow two investigators hired by Plaintiff's

counsel and another attorney to have visits and calls with Plaintiff. (ECF Nos. 74-3, Ex. B; 74-4,

Ex. C.)

### 2.  **Plaintiff's Arrival at GRVC and the Command Level Order**

Pursuant to the court's Lockdown Order, on January 17, 2019, New York City Correction

Department, Operation Security Intelligence Unit, designated Plaintiff as a centrally monitored

inmate to be placed in a CMC housing unit with waist chains and leg irons to be worn when

outside the facility and during transport. (ECF No. 36-5, p. 2-3, SAC Ex. 1.) On November 2,

2020, Plaintiff was transferred from the Manhattan Detention Complex ("MDC") to GRVC

housing unit 1a. (SAC ¶¶ 1-2.) Defendant Warden Dunbar issued a Command Level Order, CLO

370.20, setting forth the procedures and restrictions applicable to Plaintiff and other pretrial

detainees subject to similar lockdown orders.

CLO 370.20 states that its purpose is "to establish policy and procedures for the Care,

Custody and Control of the inmates under Court Ordered lockdown status." (ECF No. 36-5, p.

10-15, SAC Ex. 3.) It provides that the inmates housed in court-ordered lockdown status shall

be in "[t]wenty-three (23) hour lock-in, feed-in status" and shall be allowed to possess in their

cell one Bible, three magazines, three books, one bar of soap, one container of shampoo, one

toothbrush, one toothpaste, one plastic cup, one towel and a deodorant.  (*Id.*)  It also provides,
*inter alia*, that: (1) "[i]nmates in lock-down status shall not be removed from their cells unless a
Captain is present;" (2) "[w]henever a Court Ordered Lock-Down Inmate is removed from the
housing area, he shall be restrained in leg irons, waist chains and mitts" and "shall be under
one-on-one observation of a Correction Officer to assure no communication with any other
inmate(s), verbally, in writing or through hand signs;" (3) "these inmates shall be strip-searched,
and their property carefully searched on a daily basis;" (4) "[i]nmates will make all requests for
Law Library materials in writing," which "will be forwarded to the Security Office who will
obtain copies of the requested materials and place same in the inmate blue storage bin;" (5)
"[t]he assigned Captain will collect all letters written by the inmate" and "will turn them over to
the Security Office," and no inmates in court-ordered lockdown status will be permitted to send
out any written or other type of communication; (6) "[t]he court ordered inmates are barred
from Visits and Telephone calls to anyone other than their attorney of record," and "[a]ll calls
will be placed between the hours of 1330 -1430 hours and 1630-1730 hours;" (7) "[i]nmates will
be afforded a ten-minute shower, three (3) times per week," and "a Captain shall be present
when the inmate is removed from his cell to the shower and again when he is returned from
the shower to his cell;" (8) no incoming mail shall be forwarded to the inmates housed in the
court-ordered areas until first forwarded to the GRVC Security Office and "approved by the
Commanding Officer of (sic) his/her designee;" (9) "[i]f these inmates request religious services,
the Chaplain will be called to visit them;" (10) "[a]ny necessary medical or mental health
services are to be provided to these inmates in the housing area," and they "will not be
removed to go to the Clinic unless it is physically impossible to provide them with necessary

medical services in the cell/housing area.  Mental Health services, if required, will be provided to them in the housing area, not in the Clinic;" and (11) inmates "may be afforded recreation in accordance with the details delineated in the court order or as amended in a separate memo," and they "will be restrained in waist chains handcuffs and mitts whenever they are out of their cells for recreation."  (*Id.*)  Plaintiff learned about CLO 370.20 on November 3, 2020.  (SAC ¶ 3.)

  **3.** **Minimum Standards**

  Plaintiff asserts that subjecting him to CLO 370.20 violates the BOC's Minimum Standards, which provide that: (i) "all prisoners shall be permitted to shave daily" (SAC ¶ 41, Minimum Standard 1-03(c)(1)); (ii) "all prisoners shall be granted access to facility law library for a period of at least two hours each day the library is open[ ]" (SAC ¶ 44, Minimum Standard 1-08(f)(4)); (iii) "all prisoners shall have reasonable access to type writer (sic), dedicated word processor and photocopies for the purpose of preparing legal documentation" (SAC ¶ 44, Minimum Standard 1-08(g)(2)); (iv) "recreation shall be at least one hour; recreation must be made available seven days a week in the outdoor recreation area" (SAC ¶ 46, Minimum Standard 1-06(c)); (v) "all out-going mail for prisoners shall be sealed by the prisoner and deposited in a locked receptacle box" (SAC ¶ 49, Minimum Standard 1-11(c)(4)); (vi) "all prisoners are entitled to reasonable observance of dietary laws or fasts established by their religion" (SAC ¶ 50, Minimum Standard 1-07(f)); (vii) "correctional personnel shall never prohibit delay or cause to prohibit or delay inmates access to care or appropriate treatment. All decisions regarding medical attention needs shall be made by health care personnel" (SAC ¶ 51, Minimum Standard 3-02(b)(4)); (viii) "all medical treatment or physical examination shall occur inside of appropriate treatment areas . . . except as needed in the event of an acute

emergency" (SAC ¶¶ 51, 106 Minimum Standards 3-02(b)(4), 3-06(b)(5)); (ix) "the department

shall make available to prisoners an adequate amount of equipment during the recreation

period" (SAC ¶ 110, Minimum Standard 1-06(d)(1)); (x) the "law library will be kept opened for

prisoners use all holidays except New Years, July 4, Thanksgiving and Christmas" (SAC ¶ 151,

Minimum Standard 1-08(f)(iv)); and (xi) "each law library shall be open[] for a minimum of five

days per week including at least one (1) weekend day" (SAC ¶ 151, Minimum Standard 1-08(2)).

### 4.  Plaintiff's Complaints

#### a.  *Violations Based on Religion*

Plaintiff asserts that he is Jewish and has been classified as such since he entered the

New York City Department of Correction ("DOC"), on March 15, 2018.  (SAC ¶ 78.)

Nonetheless, Plaintiff alleges that despite informing Defendants numerous times that he is

Jewish, he was not provided a kosher meal on various days in his first month at Rikers and then

on several other occasions thereafter when the facility was in "alarm" status, which resulted in

Plaintiff not eating on those days.  (SAC ¶¶ 12, 13, 18, 38, 58, 79, 80, 83, 100, 123, 125, 131,

136, 140, 144, 145, 260, 262.)  On November 27, 2020, Plaintiff was informed by a prison staff

member that there had been an error in the system regarding his meals, which was corrected,

and that the Plaintiff would begin receiving kosher meals.  (SAC ¶ 149.)  Plaintiff received his

first kosher meal on that day.  (SAC ¶ 150.)

On November 24, 2020, Plaintiff was informed by CO Day that he would never see a

Rabbi because he was not classified as Jewish.  (SAC ¶ 141.)  On November 27, 2020, Plaintiff

requested to call the Rabbi to engage in religious services and prayer, but his request was

denied without reason.  (SAC ¶ 153.)  On several other occasions, Plaintiff was not allowed to

see a Rabbi when he requested—although it appears that Plaintiff was sometimes provided access to a Rabbi.  (SAC ¶¶ 54, 182, 213, 255.)  Plaintiff also requested a Torah on several occasions but was not provided with one.  (SAC ¶¶ 34, 38, 190.)  It was not until a Rabbi intervened that Plaintiff received a copy of the Torah on January 9, 2021.  (SAC ¶ 215.)  The explanation given for not previously being provided a Torah was that Plaintiff was on restricted status.  (SAC ¶¶ 213, 215.)  Some of the limitations on access to religious services also appear to have been related to COVID-19 pandemic lockdowns.  (ECF Nos. 36-3, p. 10; 36-4, p. 18.)  Notwithstanding the explanations provided, Plaintiff contends that he was not advised that any restrictions or deprivations of his religious requests were for a valid penological purpose.  (ECF No. 36-4, p. 17.)

Plaintiff complains that some of the Defendants denied his religious identity, insulted, and intimidated him.  (SAC ¶¶ 78, 82.)  For example, ADW Carter stated on November 11, 2020: "And all that Jewish shit cut it we don't care what you are here you eat what we feed you and you read a Bible not a Tora[h] per CLO 370.20."  (SAC ¶ 67.)  When Plaintiff informed Warden Dunbar that he is Jewish and requested a copy of the Torah, on November 6, 2020, she responded: "Since when do they make Jews that look like you," and "You are not Jewish Mr. Williams I know your pedigree and that is how I know that you are enhance restraint."  (SAC ¶ 38.)

The following Defendants are mentioned in connection with Plaintiff's claims regarding interference with the practice of his religion:  Carter (SAC ¶¶ 4, 34, 67, 79, ECF Nos. 36-2, p. 28-29; 36-3, p. 2), Dunbar (SAC ¶¶ 12, 82, ECF Nos. 36-2, p. 29; 36-1, p. 2-3, 36-3, p. 2), Vallejo (SAC

¶ 50), CO Sherma (SAC ¶ 78), CO Ramirez (SAC ¶ 18, 23), CO Sherman and Captain Blake (ECF

No. 36-3, p. 93).[5]

### b.   *Denial of Access to Counsel, Law Library and Court*

#### i.      *Denials and Limitations of Phone Calls to Attorneys*

Plaintiff asserts that, although his Lockdown Order does not limit phone calls to his

attorneys, the CLO limits them to the time periods between 1:30 and 2:30 p.m. and 4:30 and

5:30 p.m.  Nonetheless, Plaintiff's numerous requests to make phone calls to his attorneys were

denied, including for example, on November 3rd, 4th, 5th, 8th, 13th, 15th, 23rd, 2020 (SAC ¶¶

5, 10, 20, 56, 81, 108, 132-33), December 24th, 27th, 28th, 2020 (SAC ¶¶ 205, 208-09), January

3rd, 10th, 11th, 18th, 2021 (SAC ¶ 210, 216, 222), February 8th, 2021 (SAC ¶ 231), and April

11th and 12th, 2021 (SAC ¶ 263).

#### ii.      *Denials of Attorney Visits*

Plaintiff alleges that on November 9, 2020, he was denied a visit with his attorney when

the attorney's entry was refused due to an alarm.  (SAC ¶ 62.)  On April 1, 2021, Plaintiff's

attorney attempted to meet with him, but his request was denied because the facility officials

did not escort Plaintiff to a legal counsel room despite his attorney waiting for two hours.  (SAC

¶ 261.)

#### iii.      *Lack of Confidentiality in Communications with Attorneys*

Plaintiff alleges that prison officials listened to his confidential conversations with his

attorneys, including on November 6, 2020, when CO McNeil instructed Plaintiff to ensure he

---

[5] It is unclear to the Court whether CO Sherma and CO Sherman are the same person (i.e., whether "Sherma" is simply a typo).

correctly spelled his name in Plaintiff's complaint, after a phone call with his attorney (SAC ¶ 40); on November 7, 2020, when CO Ritter stood directly in front of Plaintiff's door and gave him a short phone line to speak with his attorney (SAC ¶ 47); and on December 15, 2020, when CO Hickson also gave Plaintiff a short phone line, allowing CO Hickson to eavesdrop while standing in front of the door (SAC ¶ 189).  During a November 11, 2020 visit with his attorney, while Plaintiff was pointing out correctional personnel responsible for denying him showers as they were passing by, ADW Carter saw this, interrupted the visit and attempted to inform Plaintiff's attorney that he allowed Plaintiff to shower that day.  (SAC ¶ 73.)  According to Plaintiff, the lack of confidentiality had a deterring effect on him and affected how he communicated with his defense team, ultimately affecting how they marshaled the defense in his criminal case.  (SAC ¶ 189.)

> ### iv.   _Denial of Access to the Courts_

On November 12, 2020, Plaintiff had a video court appearance in the criminal action against him, but CO Sherma informed him that Plaintiff's video court session had been denied by Warden Dunbar.  (SAC ¶ 77.)

> ### v.   _Denial of the Law Library Access, Removal of Legal Papers, and Handling of Legal Mail_

In support of his allegations concerning denial of access to the law library, Plaintiff included in the SAC Exhibit 14, which is an October 26, 2020 BOC Central Officer Review Committee Recommendation that was issued following Plaintiff's appeal from the denial of his August 30, 2020 grievance seeking a tablet to conduct legal research.  (ECF No. 36-6, p. 13-17.) In that recommendation, BOC noted that Plaintiff's Lockdown Order does not limit his access to law library or legal research materials and recommended that Plaintiff be provided access to

the law library or, if that was not possible, access to Lexis Nexis in his housing area via a kiosk or a tablet.  (*Id.*)  It was noted in the recommendation that, in restrictive housing areas, a law library kiosk is located in a vacant cell in the housing area.  (*Id.*)  Moreover, it stated the DOC should ensure that Plaintiff has access to the law library when he is moved to another jail.  (*Id.*)

Plaintiff alleges that his requests for law library services were denied numerous times, including on November 4th and 7th, 2020.  (SAC ¶¶ 10, 43-44).  On November 17, 2020, Plaintiff requested access to the law library to review his discovery via a thumb drive and laptop, but that request was denied because the facility could not locate his discovery speculating it was not mailed from MDC.  (SAC ¶ 114.)  The same day, Plaintiff's request to use a spare cell with a typewriter and dedicated word processor was denied because the facility did not have such a cell and did not allow Plaintiff to travel to the law library.  (SAC ¶ 115.)  Plaintiff's access to the library was also denied on November 27, 2020, which was the Friday after Thanksgiving and not a recognized holiday.  (SAC ¶ 152.)  Plaintiff also asserts that he learned from his attorneys that the prosecutor in his case was attempting to obtain his handwriting to be used as an exemplar against a crucial piece of evidence.  Thus, by denying him the right to use the facility Law Library, he was required to use pen and paper when corresponding back and forth, which ultimately forced him to give up a sample of his handwriting.  (ECF No. 36-2, p. 15).

On November 7, 2020, Plaintiff released his court-addressed legal mail to CO Hickson, who informed Plaintiff that his legal mail will be treated as provided in the CLO.  (SAC ¶¶ 48-49.)  On November 13, 2020, Plaintiff was informed that all his law library requests have to pass security first, both going out and coming in.  (SAC ¶ 85.)  On November 29, 2020, Plaintiff's cell

was searched and legal papers, including multiple grievances, were removed.  (SAC ¶ 166).

During a December 23, 2020 search of the Plaintiff's cell, the first draft of his complaint in this

action along with 52 stamps were confiscated, and Plaintiff did not receive a receipt for same.

(SAC ¶ 199.)

### c. Being Placed in Enhanced Restraints

Plaintiff alleges that his Lockdown Order does not require enhanced restraints, which

were imposed on him under the CLO, in violation of his due process rights, and he was treated

worse than an animal.  (SAC pp. 108-09).  On November 9, 2020, Plaintiff was taken to his

medical appointment at the mini-clinic in enhanced restraints, which was kept on his body

while medical staff examined him.  (SAC ¶ 61.)  On November 11, 2020, Plaintiff was placed in

enhanced restraints during his legal visit despite his protests.  (SAC ¶ 71.)

On November 16, 2020, Plaintiff was also informed that, if he wanted to go to

recreation, he would have to be handcuffed for the entire recreation period.  (SAC ¶¶ 109-10.)

On November 29, 2020, Plaintiff alleges that he was locked in his cell for almost 22 hours while

handcuffed.  (SAC ¶ 165.)  On January 21, 2021, Captain Merenych ordered that Plaintiff be

placed in enhanced restraints to attend his video court appearance, which Plaintiff protested.[6]

(SAC ¶ 218.)  However, CO McNeil informed Captain Merenych to take Plaintiff to his video

court appearance without enhanced restraints because "they did not want the plaintiff seen by

City Lawyers in Enhance Restraint."  (*Id.*)

---

[6] Plaintiff spells this Defendant's name as Mervich.  The Court uses the spelling provided by Defendants because it assumes the Defendants have provided the correct spelling of their own names.

### d.  *Denial of Showers, Recreation, Recreational Equipment and Request to Clean His Cell*

At some point Plaintiff was moved to housing unit 2 (SAC ¶ 8) and, upon inspection of his cell, he saw that the toilet seat and cell walls were covered with what looked and smelled like human feces (SAC ¶ 9).  Plaintiff requested materials to clean his cell, which was denied. (SAC ¶¶ 9-10.)  Defendants repeatedly denied his requests to take showers and for shaving razors.  (SAC ¶¶ 2-4, 16, 41, 64, 135, 142.)  Similarly, Plaintiff's requests for recreation were denied, including on November 8, 2020 (SAC ¶ 53), March 5th, 6th, 9th, 11th, 12th, 16th, 18th, and 21st, 2021 (SAC ¶ 250), and April 1st, 4th, 8th, 2021 (SAC ¶ 258).  When Plaintiff requested recreation equipment, he was informed that the recreation area did not contain a dip bar or a pull up bar.  (SAC ¶¶ 110, 220, 221.)

### e.  *Violations Based on Medical Care and Lack of Privacy*

Plaintiff alleges that he was denied medical examination and treatment numerous times.  On November 5, 2020, Plaintiff was denied his daily dose of mental health medication. (SAC ¶ 31.)  On November 8, 2020, instead of medical personnel, CO K. Young gave Plaintiff his nightly mental health medication.  (SAC ¶ 57.)  When Plaintiff asked Dr. Blackmore to examine him in connection with ankle pain on November 9, 2020, Dr. Blackmore informed Plaintiff that he had prescribed him painkillers and that a physical examination would be impossible due to his current lockdown court order status.  (SAC ¶ 60.)

On November 13, 2020, around 7:50 p.m., Plaintiff had a gallbladder attack and experienced issues breathing and suffered severe chest pain.  (SAC ¶ 90.)  Despite requesting urgent help, Plaintiff did not receive medical attention until 11:45 p.m., when Captain Campbell discovered him on the floor barely conscious.  (*Id.*)  When medical personnel arrived, Plaintiff

was rear-cuffed, assisted from his cell to a gurney and shackled to a pole on the gurney before being transported to the facility clinic.  (SAC ¶ 91.)  Plaintiff was informed by a nurse that he needed to go to a hospital.  (SAC ¶ 93.)  During his time at the clinic, Plaintiff was shackled and handcuffed from 12:15 a.m. to 5:30 a.m. and was not allowed to go to a hospital although the medical staff informed Captain Palmer-Campbell of his condition.  (SAC ¶ 94.)  Despite being contacted, Warden Dunbar also did not permit Plaintiff to be taken outside of the facility for any reason.  (*Id.*)

On the morning of November 15, 2020, Plaintiff complained to Dr. Blackmore that he was in pain due to prolonged handcuffing and needed to be examined.  (SAC ¶ 102.)  In the afternoon, Dr. Blackmore returned to Plaintiff's cell and examined him through the cell door by asking Plaintiff to lift his hand up to the glass window.  (*Id.*)  Dr. Blackmore explained that he reviewed the Plaintiff's medical records, recognized he had arthritis and that he had been handcuffed for a few hours, and would prescribe Plaintiff medication that required him to eat beforehand.  (SAC ¶ 104.)  After Dr. Blackmore left, the inmate in the next cell began to laugh at Plaintiff about his arthritis and the medication he was prescribed, which Plaintiff felt was a violation of his privacy.  (SAC ¶ 105.)

On November 16, 2020, when Plaintiff requested that Dr. Blackmore examine him because he had unbearable pain, Dr. Blackmore responded that Plaintiff needed to give the medication a chance to work, and there was no need to be examined.  (SAC ¶ 109.)  The same day, Plaintiff was feeling suicidal but was reluctant to express this information with the mental health clinician due to the lack of privacy.  (SAC ¶ 113.)  On November 23, 2020, Plaintiff

informed Dr. Blackmore that he had a headache and believed he might have a sinus infection. (SAC ¶ 128.)  Dr. Blackmore responded that he would prescribe Sudafed.  (*Id.*)

On November 24, 2020, Plaintiff had another gallbladder attack and asked for emergency assistance, but he was informed that a captain must be present to call a medical emergency under the CLO.  (SAC ¶ 137.)  Plaintiff laid on the floor of his cell hoping to alleviate the pain and was later provided a shower that allowed him to relax and catch his breath.  (SAC ¶ 138.)  Thereafter, Plaintiff alleges he overheard prison personnel stating they would make sure his cell was sprayed with pepper spray during an upcoming extraction of a neighboring inmate.  (*Id.*)  When the extraction commenced, pepper spray was sprayed under Plaintiff's cell door, but Plaintiff's request go to the clinic for decontamination was denied.  (SAC ¶ 139.)

On November 26, 2020, due to a fire in the housing unit, smoke spread into Plaintiff's cell and began to affect his breathing.  (SAC ¶ 146.)  Plaintiff informed CO Lawrence that he had chest pain and breathing difficulties, but CO Lawrence explained that a captain needed to be present before calling for a medical emergency under the CLO.  (*Id.*)  Plaintiff received no medical assistance until four hours later when Captain Charles escorted him to the clinic.  (SAC ¶ 148.)  On November 29, 2020, during an extraction of Plaintiff, guards deployed a pepper-based chemical grenade into his cell, causing Plaintiff to suffer from smoke inhalation before opening the cell door.  (SAC ¶ 165.)

On December 9, 2020, Plaintiff discussed confidential matters with the mental health staff, including current mental health drugs and Plaintiff's feelings coping with depression, through his cell door in the presence of two corrections officers and five inmates.  (SAC ¶ 185.)  When the mental health staff left, another inmate told Plaintiff that he should kill himself since

he was depressed.  (*Id.*)  On December 21, 2020, Plaintiff was again forced to discuss

confidential mental health concerns through his cell door.  (SAC ¶ 196.)  On December 27, 2020,

Plaintiff was seen by a mental health clinician in the housing area day room where discussion

about his mental health occurred without any privacy, in the presence of other inmates and

correctional officers.  (SAC ¶ 207.)  Similarly, on March 2, 2021, when Plaintiff requested a

COVID-19 vaccine, he was forced to discuss his medical information in the presence of five

inmates and two correctional officers.  (SAC ¶ 245.)

> ### f.   *Allegations of Retaliation*

Plaintiff asserts that he was transferred to GRVC and has been subjected to Defendants'

retaliatory conduct based solely on his civil litigation and complaints against prison officials.

(SAC ¶ 244.)  Defendants told Plaintiff on numerous occasions that his mistreatment at GRVC

was due to his lawsuit against Captain Mathis and complaints he made since his arrival at GRVC,

that he would "go through hell" at GRVC (SAC ¶¶ 23, 49), and he better get used to denials of

kosher meals, showers, razors (SAC ¶ 79), and phone calls to his attorneys (SAC ¶ 81).

Defendants also informed Plaintiff numerous times that his problems would stop if he would

drop his lawsuits and stop complaining.  (SAC ¶¶ 97, 101, 116, 133, 139, 158, 161.)  On

November 19, 2020, CO Hickson told Plaintiff, "I don't care how many law suits (sic) you put in

per my Warden we are going to squeeze you until you suffocate like George Floyd then your

law suit [sic] wont [sic] mean shit when you are dead."  (SAC ¶ 119.)  On November 20, 2020,

Warden Dunbar told Plaintiff, "You are going to not be satisfied until you get fucking killed

messing around with me boy, I do what I do cause I can get away with it."  (SAC ¶ 121.)  On

November 29, 2020, Plaintiff was placed naked inside the shower area for a few hours because he refused to reveal how he obtained a copy of CLO 370.20.  (SAC ¶ 167.)

**LEGAL STANDARD**

1. <u>**Motion to Dismiss Under Rule 12(b)(6)**</u>

When considering a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all inferences in the Plaintiff's favor.  *Littlejohn v. City of New York*, 795 F.3d 297, 306 (2d Cir. 2015).  To survive a motion to dismiss, the complaint must contain "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While detailed factual allegations are not required, the complaint must contain more than mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" or "'naked assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).  As the Supreme Court explained in *Iqbal*, the "plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate only when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief."  *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir. 2000).

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted 'to raise the strongest arguments that they *suggest.*'"  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quoting *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)).

At the motion to dismiss stage, the Court may consider any document "attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference," as well as "documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit[.]" *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citations omitted).

   2.   **Claims Under 42 U.S.C. § 1983**

Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured[.]" 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citation omitted).

Failing to allege that a defendant was personally involved in, or responsible for, the conduct complained of renders a Section 1983 claim "'fatally defective' on its face." *Alfaro Motors, Inc.* v. *Ward*, 814 F.2d 883, 886 (2d Cir. 1987) (quoting *Black v. United States*, 534 F.2d 524, 527-28 (2d Cir. 1976)). Equally, "group pleading," which "fail[s] to differentiate as to which defendant was involved in the alleged unlawful conduct," is insufficient to state a claim under

19

Section 1983. *Myers* v. *Moore*, 326 F.R.D. 50, 60 (S.D.N.Y. 2018) (quoting *Leneau v. Ponte*, 2018

WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018)).  To prevent dismissal, a plaintiff must make specific

factual allegations against each defendant.  *Thomas* v. *Venditto*, 925 F. Supp. 2d 352, 363

(E.D.N.Y. 2013) (citation omitted).

         To establish a *Monell* claim to hold a municipality "liable under [Section] 1983 for the

unconstitutional actions of its employees, a plaintiff is required to plead and prove three

elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a

denial of a constitutional right."  *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  The

plaintiff may show the existence of such a policy or custom by identifying any of the following:

(i) an express policy or custom; (ii) an authorization of a policymaker of the unconstitutional

practice; (iii) failure of the municipality to train its employees, which exhibits a "deliberate

indifference" to the rights of its citizens; or (iv) a practice of the municipal employees that is "so

permanent and well settled as to imply the constructive acquiescence of senior policymaking

officials."  *Corley* v. *Vance*, 365 F. Supp. 3d 407, 438 (S.D.N.Y. 2019) (quoting *Biswas v. City of

New York*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013)), *aff'd sub nom. Corley* v. *Wittner*, 811 F.

App'x 62 (2d Cir. 2020); *see also Outlaw* v. *City of Hartford*, 884 F.3d 351, 372-73 (2d Cir. 2018)

(discussing what constitutes official municipal policy and deliberate indifference).

         **3.  Qualified Immunity**

         "Qualified immunity shields government officials from liability for civil damages as a

result of their performance of discretionary functions, and serves to protect government

officials from the burdens of costly, but insubstantial, lawsuits."  *Lennon v. Miller*, 66 F.3d 416,

420 (2d Cir. 1995) (citation omitted).  "Government actors performing discretionary functions

are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021). "[T]he qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *City of Tahlequah*, 142 S. Ct. at 11 (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

In the context of a motion to dismiss, "[t]he defendant 'must . . . show not only that the facts supporting the defense appear on the face of the complaint, but also that it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" *Horn v. Stephenson*, 11 F.4th 163, 170 (2d Cir. 2021) (quoting *Brown v. Halpin*, 885 F.3d 111, 117 (2d Cir. 2018)).

## DISCUSSION

### 1. RULE 8(A)(2) OF THE FEDERAL RULES OF CIVIL PROCEDURE

Defendants argue that Plaintiff's complaint should be dismissed for failure to comply with Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal of a complaint for failure to comply with Rule 8(a)(2) "is usually

reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

The SAC already has been reviewed under 28 U.S.C. §1915(e)(2)(B) and certain defendants and claims were dismissed from the action.  (ECF Nos. 60, 96.)  Although the SAC is lengthy and contains unnumbered paragraphs in which Plaintiff alleges his injuries and identifies his causes of action (ECF Nos. 36-2, p. 9 to 36-4, p. 29, SAC p. 64-139), those paragraphs are clear, delineated and, for the most part, short or conclusory not requiring any discerning.  Its mere length and multiple causes of action are not a basis to dismiss under Rule 8(a)(2).  *Salahuddin*, 861 F.2d at 43 ("Despite its length, however, Salahuddin's complaint is neither vague nor incomprehensible.").  Thus, dismissal of the SAC pursuant to Fed. R. Civ. P. 8 is not warranted in the circumstance of this case.

To the extent that the unnumbered paragraphs require any response, Defendants may number them by continuing Plaintiff's paragraph numbering or in any other reasonable fashion.

2. **MINIMUM STANDARDS AND LOCKDOWN ORDER VIOLATIONS**

As a threshold matter, when evaluating each of Plaintiff's claims, they must be analyzed bearing in mind that he was subject to a court issued Lockdown Order which precipitated the CLO.  Thus, a penological purpose for the restrictions are presumptively valid, at least insofar as the CLO's requirements are consistent with the state court's Lockdown Order.  *See Avery v. Turn Key Health Clinics, LLC*, 2020 WL 714176, at *9 (W.D. Ark. Feb. 12, 2020), aff'd, 839 F. App'x 26 (8th Cir. 2021) (noting that "Security of the criminal justice process, enforcement of a court's orders, protection of victims and witnesses are legitimate penological interests"); *see*

*also Hubbard v. Johnson*, 2019 WL 5579507, at *4 (N.D. Cal. Oct. 29, 2019); *Pickford v. Lake Cnty. Cmty. Correction*, 2015 WL 3822262, at *2 (N.D. Ind. June 19, 2015).

Defendants argue that, to the extent Plaintiff's claims are based on a violation of the Board of Corrections' Minimum Standards, no claim under Section 1983 can lie insofar as the Minimum Standards do not set the constitutional standard.

Although the Second Circuit does not appear to have ruled on the issue, district courts in this Circuit consistently have found that BOC's Minimum Standards do not, standing alone, establish a violation of a federally guaranteed right for purposes of Section 1983. *Winters v. City of New York*, 2020 WL 4194633, at *5 (S.D.N.Y. July 21, 2020); *Knight v. Mun. Corp.*, 2016 WL 4030632, at *6 n.7 (S.D.N.Y. July 26, 2016); *Walker v. Shaw*, 2010 WL 2541711, at *6 (S.D.N.Y. June 23, 2010).  The rationale for these decisions is that the Minimum Standards, set by state law, are tantamount to procedural guidelines for prisons that the state chooses to require. *Korkala v. N.Y.C. Dep't of Corr.*, 1986 WL 9798, at *4-5 (S.D.N.Y. Sept. 4, 1986) (citations omitted).  Thus, to the extent they require more than what is required by the Constitution, they do not form the basis of a claim under Section 1983.  To the extent that the Minimum Standards align with Constitutional standards, those are addressed separately below when addressing the Constitutional claims.  Accordingly, as violation of the Minimum Standards in and of themselves do not establish the basis for the deprivation of Constitutional right, I recommend that Plaintiff's claims for violation of the Minimum Standards be dismissed.

   3. **VIOLATIONS BASED ON RELIGION**

Plaintiff complains that he was not provided with kosher meals in November when he first arrived at Rikers and occasionally on other days thereafter when there was an "alarm"

status.  Plaintiff alleges that on a few occasions he was also not permitted to talk with a Rabbi

and participate in Jewish services.  Additionally, Plaintiff alleges that he was initially denied

provision of a Torah and only provided a Christian Bible—a situation that lasted for

approximately three months and only resolved after intervention by the Rabbi—and that he

was ridiculed and questioned about the sincerity of his religious beliefs by prison staff.

Although Plaintiff asserts that in late November he was informed that there had been an error

in the system as to his religious dietary needs and that the situation would be rectified, there is

no allegation that such an error actually existed.  However, there is an allegation that Plaintiff

has been classified as Jewish since entering the DOC system on March 15, 2018, and Plaintiff

asserts that he informed Defendants numerous times that he is Jewish.

Defendants argue that these allegations fail to state a claim for violation of Plaintiff's

First Amendment rights.  In the main, they argue none of the alleged deprivations amounted to

a substantial burden on Plaintiff's religion or prevented him from exercising his religious beliefs.

As to the meals, Defendants argue that there was simply a mistake in the computer system,

meaning that any deprivation in November was unknowing, and that any failure to deliver

kosher meals during an "alarm" status was safety-related and thus justified.  They also assert

they are entitled to qualified immunity as to the initial denial of meals based on the computer

system error.[7]

---

[7] Plaintiff also asserts claims under RLUIPA based on the same allegations on which he bases his First Amendment Free Exercise Clause claims.  RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005).  RLUIPA ensures "greater protection for religious exercise than is available under the First Amendment." *Ramirez v. Collier,* 142 S. Ct. 1264, 1277 (2022) (quoting *Holt v. Hobbs*, 574 U.S. 352, 357 (2015)).  Defendants do not advance any argument for dismissal of Plaintiff's RILUPA claims.  Accordingly, Plaintiff's RLUIPA claims remain in the action.  The Court also construes the SAC as

"The First Amendment, applicable to the States by reason of the Fourteenth

Amendment," *Cruz v. Beto*, 405 U.S. 319, 322 (1972), provides that "Congress shall make no law

respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const.

amend. I.  "Inmates clearly retain protections afforded by the First Amendment, including its

directive that no law shall prohibit the free exercise of religion."  *O'Lone v. Est. of Shabazz*, 482

U.S. 342, 348 (1987) (citations omitted).  "[W]hen a prison regulation impinges on inmates'

constitutional rights, the regulation is valid if it is reasonably related to legitimate penological

interests*." Id.* at 349 (citation omitted).

Courts consider the following factors in determining the reasonableness of a regulation

or conduct burdening religious exercise: (1) whether there is a "'valid, rational connection'

between the prison regulation and the legitimate governmental interest put forward to justify

it;" (2) "whether there are alternative means of exercising the right that remain open to [the]

prison inmate;" (3) "the impact accommodation of the asserted constitutional right will have on

guards and other inmates, and on the allocation of prison resources generally;" and (4) "the

absence of ready alternatives is evidence of the reasonableness of a prison regulation*." Turner

v. Safle*y, 482 U.S. 78, 89-91 (1987) (citations omitted).  Assuming that the required burden on

religious exercise under the Free Exercise Clause must be substantial, the Second Circuit stated

that "establishing a substantial burden is 'not a particularly onerous task.'"  *Brandon v. Kinter*,

---

stating a claim for denial of equal protection under the Fourteenth Amendment insofar as it asserts the CLO
provided for Bibles to be given to detainees but not Torahs.  Defendants have not made a specific argument for
dismissal of this claim, so it too remains in the action.

938 F.3d 21, 32 (2d Cir. 2019) (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 202 (2d Cir. 2004)).

The Second Circuit also has noted that "courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights." *McEachin*, 357 F.3d at 203. Nonetheless, "incidents that are isolated, or few in number, involving a denial of religiously-mandated food, do not give rise to a First Amendment claim*." Maldonado v. Westchester County*, 2021 WL 356155, at *5 (S.D.N.Y. Feb. 2, 2021) (quoting *Washington v. Afify*, 968 F. Supp. 2d 532, 538 (W.D.N.Y. 2013) (collecting cases); *see also Wright v. Bibens*, 2018 WL 5724009, at *6 (D. Conn. Nov. 1, 2018) (holding that "[n]o reasonable jury could conclude that the denial of eight common fare meals over a four-day period substantially burdened the plaintiff's ability to practice his religion.").

Similarly, a prison must permit a "reasonable opportunity for an inmate to engage in religious activities but need not provide unlimited opportunities." *Van Wyhe v. Reisch*, 581 F.3d 639, 657 (8th Cir. 2009); *see also Czekalski v. Hanks*, 2020 WL 7231358, at *22 (D.N.H. Dec. 8, 2020). At least one court within this District has recognized that the state was not required to provide an inmate with the spiritual counselor of his choice. *Graham v. Coughlin*, 2000 WL 1473723, at 6 (S.D.N.Y. Sept. 29, 2000) (granting summary judgment after finding there was a legitimate penological purpose for restrictions where Plaintiff who was in administrative segregation for security reasons complained about not being provided with a Rabbi or allowed to attend Jewish services with the general prison population). Failure to provide a Torah may or may not violate a prisoner's rights depending on the reasons for the failure. See *Yahtues v. Dionne*, 2020 WL 1492877, at *12-13 (D.N.H. Mar. 27, 2020) (finding plaintiff's claim of not

being provided a Torah lacked merit because there was no evidence it was available to be provided to inmates in the restricted housing unit and no evidence of disparate treatment in provision of religious texts).

Plaintiff's allegations give rise to a plausible claim of a violation of his free exercise rights under the First Amendment with regard to the initial denial of kosher meals and the failure to be provided a Torah.  The allegations that Defendants Carter, Vallejo, Day, and Dunbar questioned the sincerity of Plaintiff's Jewish beliefs notwithstanding being told by Plaintiff that he was Jewish give rise to a plausible inference that they intentionally deprived Plaintiff of his kosher meals, a Torah, and/or requests to see a Rabbi.  Other Defendants, including Blake, Hickson, Ramirez, and Sherman, are alleged only to have failed to provide a kosher meal on various days.  It is unclear from the pleading why they did not provide the kosher meals. However, because Plaintiff asserts that he informed them he was Jewish and they nevertheless failed to provide kosher meals, the complaint plausibly states a claim.

Finally, the allegations with respect to Defendant Shoclink and Nezma are insufficient to state a Free Exercise claim against them.  Plaintiff only alleges that Shoclink informed the Rabbi that Plaintiff was not provided a Torah because he was in lockdown status per the CLO. Shoclink is not alleged to have done anything to actually interfere with Plaintiff's exercise of his religion.  As to Nezma, Plaintiff only alleges that on the evening of November 19, 2020, Nezma told him he was ordered not to allow Plaintiff to eat that evening or take a shower.  Here, Plaintiff does not allege that he was not given any meals earlier in the day.  Failure to provide a kosher meal on one occasion absent more is not sufficient to state a claim against this Defendant.  *See Maldonado*, 2021 WL 356155, at *5.

Defendants' argument that they are entitled to qualified immunity because they reasonably relied on a computer system error indicating that Plaintiff was not Jewish is beyond the scope of the instant motion because the existence of a computer error cannot be inferred in Defendants' favor from the face of Plaintiff's complaint.  *See Littlejohn*, 795 F.3d at 306-07 (the court must accept all factual allegations in the complaint as true and draw all inferences in the Plaintiff's favor).  Further, Plaintiff pleads plausibly and sufficiently the Defendants' knowledge of his religious identity and that he has been classified as Jewish since entering the DOC system on March 15, 2018.  Accordingly, Defendants are not entitled to qualified immunity as to this cause of action.  *See Sabir v. Williams*, -- F. 4th --, 2022 WL 2183439, at 9 (2d. Cir. June 17, 2022) (holding that the wardens were not entitled to dismissal of the SAC based on qualified immunity because case law and the text of a similar statute clearly established substantially burdening religious exercise without justification violated the law).

In sum, I recommend that the motion to dismiss the Free Exercise claims be denied as to Defendants Carter, Vallejo, Dunbar, Blake, Ramirez, Day, Hickson and Sherman but granted as to Shoclink and Nezma.

**4.** **CONDITIONS OF CONFINEMENT**

### *a.  Hygiene and Exercise*

Plaintiff asserts that Defendants denied his request to clean feces from his cell on one occasion, as well as numerous requests for shower, razor, recreation, and recreation equipment.  Defendants argue that there is no constitutional right to a daily shower, and sporadic denials of razor and outdoor recreation do not rise to the level of a constitutional violation.

The Constitution requires that prison officials "provide humane conditions of confinement" and "ensure that inmates receive adequate food, clothing, shelter, and medical care." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones[.]" *Id.* (internal quotation marks and citation omitted). When a plaintiff is a pretrial detainee, as here, claims related to conditions of confinement are analyzed under the Due Process Clause of the Fourteenth Amendment. *Darnell v. Pineiro,* 849 F.3d 17, 29 (2d Cir. 2017). When evaluating such a claim, courts look to "contemporary standards of decency." *Id.* at 30 (internal citation omitted).

To state a claim for deliberate indifference to conditions of confinement, a plaintiff must show that the deprivation was both objectively serious and that the defendant official acted with sufficient mens rea (the "subjective" prong of the test). *Id*. at 29. Under the objective prong, the deprivation must be sufficiently serious where "the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id*. at 30 (quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)).

Under the subjective prong, the plaintiff must show that the defendant was deliberately indifferent to any objectively serious condition of confinement. *Id*. at 32. Under the Fourteenth Amendment, this can be shown with evidence that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id*. at 35.

Numerous courts have held that unpleasant or unsanitary conditions only rise to the level of a constitutional violation if they amount to an objectively and sufficiently serious denial of the minimal civilized measure of life's necessities.  *Id.* at 30-32.  Furthermore, a plaintiff must proffer facts to show "an official's deliberate indifference to those conditions, or that that those conditions are punitive."  *Id.* at 34 n.12.

"[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'"  *Id.* at 30 (citing *Walker*, 717 F.3d at 125).  To properly assess whether conditions are sufficiently serious, the plaintiff must include information about their duration and severity; otherwise, they may be dismissed. *See*, *e.g., Figueroa v. County of Rockland*, 2018 WL 3315735, at *7 (S.D.N.Y. July 5, 2018) (dismissing conditions-of-confinement claim alleging lack of ventilation, insect infestation, and feces/bodily fluids on the walls because plaintiff did not provide details as to duration of conditions); *Jackson v. Sullivan County*, 2018 WL 1582506, at *4 (S.D.N.Y. Mar. 27, 2018) (dismissing conditions-of-confinement claim in absence of allegations regarding severity and duration).

In this case, the allegations in the SAC do not rise to the level of a constitutional violation, either alone or in the aggregate, as they suggest episodic deprivations that were short in duration and not sufficiently severe.  Plaintiff asserts that showers and razor were denied on various dates, but also concedes that showers and razors were otherwise afforded.  For example, on November 4, 2020, his request for a shower was denied in the morning, but he was afforded a shower later in the day.  (SAC ¶ 11.)  Moreover, Plaintiff fails to assert how

denials of a shower or razor on occasion posed an objective risk of serious harm to him.  *See Trammell v. Keane*, 338 F.3d 155, 165 (2d Cir. 2003) ("Deprivation of other [than toilet paper] toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference.'") (citation omitted); *Thorpe v. Vill. of Greenwich*, 2014 WL 788816, at *10 (N.D.N.Y. Feb. 25, 2014) ("Courts are reluctant to consider even a temporary deprivation of showers a constitutional violation.").

Plaintiff likewise fails to assert how being denied the ability to clean his cell when there was fecal matter on the wall on a single occasion posed an objective risk of harm.  He does not provide any information as to the duration of time he was deprived of being able to clean his cell.  Similarly, the sporadic denial of the opportunity to exercise does not rise to a constitutional violation.[8]  While the Court is sympathetic to the no-doubt harsh conditions at Rikers, similar allegations have been found insufficient to state a claim.  *See, e.g.*, *Reid v. City of New York*, 2021 WL 3477243, at *11-12 (S.D.N.Y. Aug. 6, 2021) (recommending dismissal of claims of pretrial detainee who complained about unsupportive mattress, denial of indoor exercise, denial of adequately warm footwear for outdoor recreation in winter), *report and recommendation adopted*, 2021 WL 4177756 (S.D.N.Y. Sept. 14, 2021); *Washington v. Falco*, 2021 WL 797658, at *5 (S.D.N.Y. Mar. 1, 2021) (dismissing pretrial detainee's conditions of confinement claim after finding refusal to provide recreational equipment and allotting only

---

[8] As further discussed below, although the sporadic denial of recreation alleged by Plaintiff is insufficient to state a claim, Plaintiff adequately alleges that being placed in enhanced restraints while exercising violates his constitutional rights.

one to three hours for exercise were non-punitive conditions and defendants were not deliberately indifferent); *Grant-Cobham v. Martinez*, 2020 WL 2097807, at *3 (E.D.N.Y. May 1, 2020) (dismissing claim alleging dirty conditions at Rikers, including that other inmates threw feces at or near plaintiff because plaintiff failed to provide information about duration of condition and whether fecal matter built up to such an extent that plaintiff's health was placed at risk); *Trimmier v. Cook*, 2020 WL 5231300, at *5 (D. Conn. Sept. 2, 2020) ("The conditions [of] limited daily telephone calls and recreation, restrictions on commissary spending to $40.00 a day, visits only with family members, lack of access to a law library and a toilet brush and ineligibility for good time credit, parole release, halfway house placement, transitional supervision and vocational or educational programs-- do not constitute deprivations of . . . basic human needs, such as food, clothing, shelter, medical care or safety.").

Thus, I recommend granting the motion to dismiss with respect to Plaintiff's claims based on denials of shower, recreation, recreational equipment, and request to clean his cell. As to these claims, Plaintiff names Defendants Shivraj, Taylor, Quinnones, Emebu, Dychese, Drumwright[9], and Loiseau; therefore, these Defendants should be dismissed.  (*See* SAC ¶ 3, 5, 64-65, 110, 135, 142.)

### b.  Medical Claims

Plaintiff alleges that: (1) his requests for medical examination were denied by Dr. Blackmore when he prescribed pain medication for Plaintiff's severe pain due to prolonged restraint and Sudafed for Plaintiff's headache without examining him due to the CLO; (2) Dr.

---

[9] Plaintiff also alleges that Defendant Drumwright did not allow Plaintiff to visit the law library or call his attorney. As discussed below, I recommend those claims be dismissed, which leaves no pending claims as to this Defendant.

Gemo only examined him through his cell door; (3) his mental health medication was delivered to him by non-medical personnel; (4) he was not allowed to go to a hospital when he had a gallbladder attack on November 13, 2020; (5) he was denied medical assistance for his gallbladder attack and left in his cell with chest pain on November 24, 2020; (6) his request for decontamination from pepper spray was denied; (7) medical assistance was delayed four hours when he had chest pain and difficulties breathing after the fire in the unit; (8) and a pepper-based grenade was deployed to his cell causing him to suffer.

When evaluating a claim of deliberate indifference to medical needs by a pretrial detainee, the same basic two-prong test described above applies. That is, the deprivation must be sufficiently serious, and the defendant must act with a sufficiently culpable state of mind. *Darnell*, 849 F.3d at 29; *Charles v. Orange County*, 925 F.3d 73, 87 (2d Cir. 2019) ("Although *Darnell* did not specifically address medical treatment, the same principle applies here."). However, the inquiry is slightly different on the first prong. The Court assesses (1) whether the detainee "was actually deprived of adequate medical care" and (2) whether the inadequacy in medical care is sufficiently serious, which in turn "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006).

The Second Circuit has set forth a non-exhaustive list of factors for courts to consider when undertaking the inquiry on the first prong including "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.'" *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)

(quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).  To be sufficiently serious to pose a risk of damage to inmate's health, there must exist "a condition of urgency, one that may produce death, degeneration, or extreme pain."  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)).  Further, "prison officials and medical officers have wide discretion in treating prisoners, and Section 1983 is not designed to permit federal courts to interfere in the ordinary medical practices of state prisons."  *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citation omitted).

If there has been a total failure to provide treatment, the Court assesses whether the medical condition is sufficiently serious.  *Davis v. McCready*, 283 F. Supp. 3d 108, 120 (S.D.N.Y. 2017).  But if some treatment has been provided, the court focuses on any delay or interruption in treatment in assessing the seriousness of the deprivation, rather than the underlying medical condition itself, and injuries attributable to the delay or interruption in treatment.  *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003).

When assessing the subjective, or mens rea prong, the court assesses whether "an objectively reasonable person in [d]efendant's position would have known, or should have known, that [d]efendant's actions or omissions posed an excessive risk of harm" to the plaintiff. *Davis*, 283 F. Supp. 3d at 120 (citing *Darnell*, 849 F.3d at 35).  "[S]omething more than negligence is needed to elevate a claim of medical misconduct to a constitutional tort."  *Id.* at 121 (citing *Darnell*, 849 F.3d at 36).

i. __Allegations Against Dr. Blackmore and Dr. Gemo__

Plaintiff's allegations against Dr. Blackmore are insufficient to state a claim of deliberate indifference to his medical needs because Plaintiff alleges that Dr. Blackmore provided treatment for his severe pain and headache, and Plaintiff does not allege that the treatment failed to remedy his medical conditions.  Rather, Plaintiff only complains that the treatment was provided to him without examination or examination through a cell door because of the CLO. However, Plaintiff has no right to the treatment of his choice.  *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) ("[T]he essential test is one of medical necessity and not one simply of desirability.") (quoting *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. 1981)); *see also Sonds,* 151 F. Supp. 2d at 311 ("Federal courts are generally hesitant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

There are also no allegations that Dr. Blackmore acted with sufficient mens rea to satisfy the second prong of the inquiry.  Further, there are no allegations to suggest that the CLO prevented Dr. Blackmore from exercising his independent professional judgment about what medical services were necessary and directing that Plaintiff be moved to a health clinic or hospital if medically warranted.  Similarly, as Plaintiff only alleges that Dr. Gemo acted similarly to Dr. Blackmore, those claims also fail as to him.  (*See* SAC ¶ 53.)  Thus, the claims against Dr. Blackmore and Dr. Gemo should be dismissed.[10]

---

[10] Although Dr. Gemo has yet to appear in this action, he may be dismissed *sua sponte* as the allegations are substantially similar to those alleged against Dr. Blackmore.  *See Hecht v. Com. Clearing House, Inc.*, 897 F.2d 21, 26 (2d Cir. 1990) (affirming *sua sponte* dismissal of all defendants, despite one defendant not appearing in the case or joining the motion to dismiss because the issues against that defendant were substantially the same as those concerning the other defendants); *see also Frein v. Feinstein*, 2021 WL 2715799, at *3 (W.D.N.Y. July 1, 2021).

### ii.     Allegations Regarding Method of Delivering Medication and Pepper Spray

Plaintiff's allegations that Defendants delivered his mental health medication instead of medical personnel, denied his request for decontamination, and deployed a pepper-based grenade to extract him from his cell are insufficient to state a claim. Although Plaintiff complains that non-medical personnel delivered his mental health medication, his own allegations indicate that he received adequate care for his mental health needs. Thus, this complaint does not support a sufficiently serious condition. Similarly, Plaintiff's conclusory allegations that he was denied his right to go to the clinic for decontamination "after being exposed to chemical agents," (SAC ¶ 139), without factual allegations of any symptoms he experienced or their extent and duration, is insufficient to support a sufficiently serious medical need. Lastly, Plaintiff's conclusory allegation that he suffered unspecified harm when Defendants employed a pepper-spray grenade to extract him from his cell on November 29, 2020, (SAC ¶ 165), is also lacking, without more, to assert a sufficiently serious medical need. Thus, claims related to these incidents should be dismissed.

### iii.     Allegations About Gallbladder Attacks and Smoke Inhalation

Plaintiff's remaining claims of indifference to his medical needs relate to two gallbladder attacks and treatment for smoke inhalation after a fire in his housing unit. These allegations, as discussed below, are sufficient to state a claim.

Plaintiff alleges that on two occasions he had a gallbladder attack. On November 13, 2020, around 7:50 p.m., he experienced severe chest pain and breathing issues. (SAC ¶ 90.) When Plaintiff did not receive medical assistance after informing Defendant CO Coulthurst about his medical emergency, he started banging on the door, which attracted the attention of

Defendant CO Pierce who informed Plaintiff he would call a medical emergency.  (*Id*.)  Plaintiff

did not receive medical attention until 11:45 p.m., when the clinic nurse informed him and

Captain Palmer-Campbell that he needed to go to a hospital "for gall bladder (sic) removal

and/or gall bladder infection due to stones inside his gall bladder."  (SAC ¶ 93.)  Plaintiff was

rear-cuffed, placed on the medical gurney and shackled to its pole by CO Graves (SAC ¶ 91-92),

but Defendants did not allow Plaintiff to go to a hospital that day.  (SAC ¶ 94.)  On November

24, 2020, Plaintiff had another gallbladder attack and "laid on the floor in his cell trying to

maintain from chest pain while CO Day just sat there at the door and watched the plaintiff

while he was in pain," until sometime later he "was allowed to take a shower where he relaxed

and caught his breath."  (SAC ¶¶ 137-38.)  Insofar as Plaintiff alleges that a nurse advised that

his condition required treatment in a hospital and that he was in severe pain, his allegations are

sufficient to meet the objective prong of the test that his condition was sufficiently serious.

With regard to the mens rea prong, the SAC similarly sufficiently alleges that Defendants

Warden Dunbar, CO Coulthurst, CO Graves, CO Day and Captain Palmer-Campbell knew or

should have known of a risk of harm because Plaintiff stated he was in severe pain, was lying on

the floor in pain, and a nurse advised them Plaintiff needed treatment in a hospital but they did

not arrange for his transfer to the hospital.  Moreover, it took Defendants about four hours

before they took Plaintiff to the clinic for his gallbladder attack on November 13, 2020

notwithstanding his severe pain and never provided medical assistance on November 24, 2020,

instead merely providing Plaintiff the opportunity to shower.  At the pleading stage, these

allegations are sufficient to raise a plausible inference that these Defendants acted with

deliberate indifference to Plaintiff's serious medical needs.  *Darnell*, 849 F.3d at 30; *see also*

*Davison v. Rios,* 2017 WL 1843308, at *2 (W.D. Okla. May 5, 2017) (denying motion to dismiss a deliberate indifference claim where the plaintiff alleged that he "experienced two debilitating gallbladder attacks, suffered continuing extreme pain, was advised by a physician that he would continue to have attacks until he had surgery" but "was not operated on for seven months after surgery was recommended).

As for the smoke inhalation claim, Plaintiff asserts that a fire broke out and smoke spread through the housing unit causing him chest pain and problems breathing. He asked CO Lawrence to go to the clinic but had to wait four hours to be transported there. He admits that he maintained consciousness the entire time. (SAC ¶¶ 146, 148.) A reasonable person would find that prolonged exposure to smoke inhalation significantly affects an individual's breathing and, consequently, daily activities and has the potential to inflict substantial chest pain and death. *See Gumora v. City of New York*, 2018 WL 736018, at *5 (S.D.N.Y. Feb. 5, 2018) ("Courts in this district have consistently held that conditions of confinement that expose inmates to unreasonable levels of smoke satisfy the objective prong."). Thus, the Plaintiff's allegations are sufficient to plead that his medical needs related to smoke inhalation were sufficiently serious. As for mens rea, Plaintiff alleges that CO Lawrence explained to him that "he knew the policy" concerning medical emergency, "but at G.R.V.C. they did things different," and he needed to wait for a captain to be present before calling for a medical emergency. (SAC ¶¶ 146-147.)

Allegations that the Defendants were aware of the smoke and Plaintiff's complaints that he was having trouble breathings coupled with a four-hour delay in providing medical treatment give rise to a plausible inference that Defendants were deliberately indifferent to Plaintiff's medical needs on this occasion. *See Garcia v. Fischer*, 2016 WL 297729, at *7

(S.D.N.Y. Jan. 22, 2016) (finding that where the smoke condition was apparent at 2:00 a.m., but defendants failed to call the fire department until 3:17 a.m. or begin evacuating plaintiffs until 4:00 a.m., this "could give rise to the inference that defendants knew plaintiffs were being exposed to unreasonably dangerous heavy smoke, yet deliberately chose not to alleviate this for two or more hours.").

Thus, I recommend denying the motion to dismiss with regard to Plaintiff's claims against Warden Dunbar, CO Coulthurst, CO Graves, CO Day, Captain Palmer-Campbell, CO Pierce, and CO Lawrence for deliberate indifference to his medical needs in connection with the alleged delay and denial of medical assistance during Plaintiff's gallbladder attacks and delay in medical assistance for smoke inhalation.

5. **LACK OF MEDICAL PRIVACY**

In addition to complaining about indifference to his medical needs, Plaintiff asserts a claim for violation of his right to medical privacy. He alleges that: (1) on November 15, 2020, an inmate overheard his conversation with Dr. Blackmore through the cell door and laughed at the fact that Plaintiff had arthritis; and (2) on December 9, 2020, after Plaintiff discussed his current depression with the clinician through the cell door in the presence of correctional officers and proximity of other inmates, another inmate told Plaintiff that he should kill himself.

A prisoner's right to privacy in his medical information is protected by the Fourteenth Amendment. *Hancock v. County of* Rensselear, 882 F.3d 58, 65 (2d Cir. 2018). However, the right is not unqualified. *Rush v. Artuz*, 2004 WL 1770064, at *11 (S.D.N.Y. Aug. 6, 2004). "[T]he interest in the privacy of medical information will vary with the condition." *Powell v. Schriver*, 175 F.3d 107, 111 (2d Cir. 1999). For example, courts have recognized a right to privacy in an

inmate's transsexualism and HIV positive status because in the prison context these conditions may provoke hostility and intolerance from others.  *Id.*

Courts within the Second Circuit have declined to recognize a claim for violation of medical privacy with regard to disclosure of mental health disorders because such disclosure is not likely to expose an inmate to discrimination or intolerance.  *Ruple v. Bausch*, 2010 WL 3171783, at *4 (N.D.N.Y. July 21, 2010) (declining to extend Fourteenth Amendment protection where the plaintiff suffered from depression and possible liver damage).  Magistrate Judge Cott recently determined that "bipolar disorder is likely not such a condition demanding confidentiality under the Fourteenth Amendment."  *Dash v. Doe*, 2020 WL 3057133, at *3 (S.D.N.Y. June 9, 2020) (finding Magistrate Judge Cott's determination correct and adopting his Report).

Further, even if a medical condition is one demanding privacy under the Fourteenth Amendment, prison officials can impinge that right if their actions are reasonably related to legitimate penological interests.  *See, e.g.*, *Gibson v. Rosati*, 2016 WL 11478234, at *5 (N.D.N.Y. May 19, 2016) (finding that any privacy interest in plaintiff's mental health history, recent mental health diagnosis, and compliance with psychiatric medications may be impinged upon if reasonably related to penological interests); *Dash*, 2020 WL 3057133, at *3.  The law is also clear that "gratuitous disclosure of an inmate's confidential medical information as humor or gossip . . . is *not* reasonably related to a legitimate penological interest, and it therefore violates the inmate's constitutional right to privacy."  *Powell*, 175 F.3d at 112.

Plaintiff's claim that discussion of his arthritis and request for a COVID vaccine in front of others violated his right to medical privacy is without merit.  (SAC ¶¶ 105, 245.)  Neither of

these discussions relate to conditions likely to expose an inmate to discrimination or intolerance.  Further, in all of the situations about which Plaintiff complains, including discussion of his mental health, the circumstances of the discussions were related to Plaintiff's treatment and occurred in the housing unit because of Plaintiff's restricted housing status and, thus, the circumstances related to a legitimate penological purpose.  (*See* SAC Ex. 3.)  No disclosure was gratuitous or disclosed through humor or gossip.  Accordingly, these disclosures do not give rise to a constitutional claim.  *Powell*, 175 F.3d at 111-112.

Thus, I recommend dismissing Plaintiff's claim for a violation of his right to medical privacy.  This includes dismissing Defendant Islam who is only alleged to be present when Plaintiff was speaking to medical staff.[11]  (*See* SAC ¶ 24.)

6.  **COMMUNICATIONS WITH COUNSEL/ACCESS TO COURT**

Plaintiff complains that his access to counsel was unduly restrictive insofar as he was limited in the times that he could speak with his criminal defense counsel over the phone or in person and sometimes denied a call or visit.  He also complains that at times he was not given complete privacy when he met with his attorney and that, on one occasion, he was not permitted to attend a court proceeding in his underlying criminal case by video.  He also complains about various other impediments he faced in pursuing legal claims, including that he was not provided adequate access to the law library, that his legal papers and 52 stamps were removed from his cell on two occasions, that his legal outgoing mail to the court and all his law library requests were censored under the CLO.

---

[11] Plaintiff also alleges that Defendant Islam denied him his phone call and a shower pursuant to the CLO.  As I have recommended those claims be dismissed, there are no other viable claims against Defendant Islam.

Plaintiff's claims implicate his Sixth Amendment right to counsel in connection with his defense of the criminal charges against him as well as his right of access to the courts in connection with his challenge to his conditions of confinement, which is grounded in various constitutional provisions including the right to due process and equal protection. *Bourdon v. Loughren*, 386 F.3d 88, 95 (2d Cir. 2004). Prison regulations restricting a pretrial detainee's contact with his attorney may give rise to a Constitutional claim if the restrictions "unreasonably burdened the inmate's opportunity to consult with his attorney and to prepare his defense." *Benjamin v. Fraser*, 264 F.3d 175, 187 (2d Cir. 2001) (quoting *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978), *rev'd on other grounds*, *Bell v. Wolfish*, 441 U.S. 520 (1979)). Prison regulations or conditions that interfere with a prisoner's access to court in connection with challenging conditions of confinement require an evaluation of whether the prisoner has meaningful access to the tools needed to present those claims for formal adjudication by the court. *Bourdon*, 386 F.3d at 92-93. I first address complaints related to Plaintiff's Sixth Amendment rights and then address the other access-related complaints.

### a. Restrictions on Access to Counsel

A pretrial detainee's Sixth Amendment rights are violated when a prison regulation unjustifiably obstructs, infringes, unreasonably burdens, or significantly interferes with his access to counsel. *Patterson v. Ponte*, 2017 WL 1194489, at *3 (S.D.N.Y. Mar. 30, 2017), *report and recommendation adopted*, 2017 WL 1405753 (S.D.N.Y. Apr. 17, 2017) (citation omitted). To the extent access is restricted based on an institutional rule, the court must evaluate the restriction considering the goal of institutional security. *Bell*, 441 U.S. at 547; *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). Courts also have recognized that prisoners do not have

a right to unlimited telephone calls to counsel and that day and time limitations may be imposed. *See*, *e.g.*, *Bellamy v. McMickens*, 692 F. Supp. 205, 214 (S.D.N.Y. 1988); *Pino v. Dalsheim*, 558 F. Supp. 673, 675 (S.D.N.Y. 1983); *Patterson*, 2017 WL 1194489, at *4 (postponement of one phone call and inability to speak with a paralegal on one occasion did not unreasonably burden right to counsel). "Correctional officials may regulate contact with attorneys to a point" to, for example, keep staff, detainees and witnesses safe and prevent escape. *J.B. v. Onondaga County*, 401 F. Supp. 3d 320, 336 (N.D.N.Y. 2019). But, regulations must be reasonably necessary to address these legitimate penological concerns. *Id*.

Plaintiff's allegations fail to establish that his access to counsel was unreasonably burdened. Although he asserts that his requests to call his attorney were denied entirely on seven days in November 2020, four days in December 2020, four days in January 2021, one day in February 2021, and two days in April 2021, he does not allege that he was unable to communicate with his attorney by using alternative means of communication such as mail correspondence and visits. He also does not allege that there was any specific impact on his defense of his underlying criminal case as a result of not having visits on these occasions.

Additionally, it appears from the face of the SAC that on at least some occasions, the reason for the denial of the visit was an institutional concern. For example, on November 9, 2020, Plaintiff states that his attorney visit was denied due to a safety alarm. (SAC ¶ 62.) A security concern is a reasonable basis to deny an attorney visit, and the number of visits denied are not alleged to have impacted Plaintiff's criminal defense. *See Williams v. Ramos*, 2013 WL 7017674, at *5 (S.D.N.Y. Dec. 23, 2013).

Similarly, the CLO's temporal restrictions of Plaintiff's phone calls to his attorneys are reasonably related to legitimate penological interests, namely keeping witnesses safe as noted in the Lockdown Order, and did not foreclose Plaintiff's communications with his attorney. Plaintiff fails to allege that temporal restrictions of phone calls to his attorney imposed by the CLO were sufficiently serious or burdensome to constitute objective deprivations of his right to due process.

While Plaintiff's claims regarding denial of occasional visits and calls with his defense counsel do not rise to the level of a constitutional violation, his allegations regarding denial of private consultations with his counsel are sufficient to state a claim. The Sixth Amendment right to counsel includes the right to communicate with counsel in confidence. *Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977) ("[T]he Sixth Amendment's assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the criminal proceeding."); *United States v. Rosner*, 485 F.2d 1213, 1224 (2d Cir. 1973) ("[T]he essence of the Sixth Amendment right is, indeed, privacy of communication with counsel."); *see also J.B.*, 401 F. Supp.3d at 336 (granting class certification in action challenging state interference with right to counsel and injunction requiring prison to allow private meeting spaces and recognizing that forcing prisoners to consult attorneys in the presence of other prisoners or guards compromises their Sixth Amendment right to counsel).

Defendants appear to concede that the allegations regarding lack of privacy with counsel are sufficient to state a claim, as they did not make a specific argument to dismiss this

aspect of Plaintiff's complaint.  Accordingly, I recommend that the motion to dismiss Plaintiff's

claims relating to denial of occasional attorney visits and phone calls and temporal limitations

on them be dismissed for failure to state a claim.  This includes dismissing Captain Smith, as

Plaintiff only alleges Smith denied him the right to call his attorney on a single occasion due to

an alarm.  (*See* SAC ¶ 56.)  This leaves only the Sixth Amendment lack of privacy claims against

CO McNeil, CO Ritter, CO Hickson, and ADW Carter.

### b.  *Video Court Appearance*

Plaintiff alleges that Defendants denied him the ability to attend his November 12, 2020

video court appearance in his criminal case.  However, Plaintiff does not allege the nature and

purpose of the video conference or that he suffered any actual injury or adverse impact from

his lack of attendance.  (SAC ¶ 77; p. 85.)  Here, Plaintiff's right to attend court conferences and

hearings are not unqualified, and his attendance is not required "in circumstances involving

matters of law or procedure that have no potential for meaningful input from a

defendant."  *Ponzo on behalf of Inmates of Jefferson Cnty. v. County of Jefferson*, 2019 WL

4573249, at *3 (N.D.N.Y. Sept. 20, 2019), *report and recommendation adopted*, 2019 WL

5883684 (N.D.N.Y. Nov. 12, 2019) (quoting *DePallo v. Burge*, 296 F. Supp. 2d 282, 289 (E.D.N.Y.

2003)).  By failing to allege the nature of the proceeding of the video court conference,

Plaintiff's pleading is factually deficient.  *See id.*

Additionally, to the extent Plaintiff was denied attendance at a specific proceeding in his

underlying criminal case, that is an issue to raise through his criminal defense attorney in that

case, not in the instant action brought under Section 1983.  *See Younger v. Harris*, 401 U.S. 37,

41 (1971) (federal court should abstain from interfering with a pending state prosecution); *Trump v. Vance*, 941 F.3d 631, 637 (2d Cir. 2019) (same).

Accordingly, any allegation pertaining to denial of participation in this particular court conference should be dismissed.

### c. Restrictions on Use of Law Library, Legal Mail and Removal of Legal Papers

An inmate's rights to mail, packages, law library, and telephone calls and communications may be restricted if the restrictions employed are reasonably related to legitimate penological interests such as security. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *Thornburgh v. Abbott*, 490 U.S. 401, 409, 413 (1989); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 210 (N.D.N.Y. 2015). Further, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" *Lewis v. Casey*, 518 U.S. 343, 351 (1996) (quoting *Bounds v. Smith*, 430 U.S. 817, 825 (1977)). Law library facilities are merely "one constitutionally acceptable method to assure meaningful access to the courts," and alternative means may also achieve the goal of access to the courts. *Id.* To state a claim for denial of access to the courts, a plaintiff must allege facts showing that the defendant's conduct "was deliberate and malicious, and that the "defendant's actions resulted in actual injury to the plaintiff." *Banks v. County of Westchester*, 168 F. Supp. 3d 682, 692 (S.D.N.Y. 2016) (quoting *Bellezza v. Holland*, 730 F. Supp. 2d 311, 314 (S.D.N.Y. 2010). To demonstrate actual injury, a plaintiff must allege: (1) a valid underlying cause of action separate from the right-of-access claim; and (2) frustration or hindrance of the litigation caused by the defendant's actions. *See Christopher v. Harbury*, 536 U.S. 403, 415 (2002).

Plaintiff's denial of court access claims relating to removal of his legal papers, regulation and censorship of mail, and access to the law library relating to his underlying criminal case fail to state a claim because Plaintiff, represented by retained counsel in that case, has not alleged that any of these actions impacted his defense of the criminal charges against him.  *See Lewis*, 518 U.S. at 351 (holding that to assert a violation of access to the courts based on denial of law library services, a prisoner must show that "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim").  Notably, Plaintiff did not assert any facts explaining how Defendants' denials of his requests to use the law library or the lack of a library kiosk in his housing unit prejudiced him or hindered his efforts to assist his counsel in representing him in his underlying criminal case or in prosecuting this or any other action.  *See Gamble v. City of New York ex rel. NYC Dep't of Corr.*, 2009 WL 3097239, at *6 (S.D.N.Y. Sept. 25, 2009) ("The Constitution . . . 'does not require unlimited and unrestricted access to a law library at the demand of a prisoner'" and "prison officials may place reasonable restrictions on inmates' use of facility law libraries as long as those restrictions do not interfere with inmates' access to the courts.").

The Court notes that Plaintiff's complaints about access to the law library are premised on the fact that Rikers restricted his access more than recommended by the BOC Central Officer Review Committee.  That Committee recommended that Plaintiff be provided with access to the law library or a library kiosk located in a vacant cell within the unit.  (ECF No. 36-6, p. 13-17.)  However, the Warden at Rikers was not required to adopt this recommendation and was free to institute other regulations aimed at addressing institutional concerns—i.e., safety.  *See Legal Aid Soc. v. Ward,* 457 N.Y.S.2d 250, 252 (1st Dep't 1982).  To the extent that Plaintiff

complains that prison guards "censored" his library requests, this "censorship" appears to be limited to ensuring Plaintiff did not use the library service to communicate with others in a way prohibited by the state court Lockdown Order to ensure safety of witnesses slated to testify against him.  (SAC Ex. 3.)  Plaintiff does not allege that he was impeded in the prosecution of any legal claims or that his underlying criminal defense was negatively impacted by this alleged censorship.

Similarly, Plaintiff asserts that Defendants removed legal papers from his cell on two occasions, including multiple grievances and the first draft of the complaint in this action along with 52 stamps.  (SAC ¶ 199.)  Here again, however, Plaintiff fails to allege what, if any, injury he suffered as a result of these incidents or how such removal actually impeded his meaningful access to the courts or prejudiced his pending proceedings.  Thus, he fails to state a claim based on these restrictions/actions.

With regard to alleged interference with his mail, the Second Circuit has recognized that "[i]nterference with legal mail implicates a prison inmate's rights [of] access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).  To state a claim for denial of access to the courts based on interference with legal mail a plaintiff must assert "that the defendant took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'"  *Id.* (quoting *Monsky v. Moraghan*, 127 F. 3d 243, 247 (2d. Cir 1997)).  "Restrictions on prisoners' mail are justified only if they 'further[ ] one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'"  *Id.* (quoting *Washington v.*

*James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).  "[C]ourts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail."  *Id.* (citation omitted).  In *Davis*, the district court dismissed the plaintiff's allegations of two instances of tampering with his mail on the ground that he had "not alleged that the interference with his mail either constituted an ongoing practice of unjustified censorship or caused him to miss court deadlines or in any way prejudiced his legal actions," *Id.* at 352, and the Second Circuit affirmed the dismissal.  *Id.* at 354.

Plaintiff asserts that his legal outgoing mail to the court was censored under the CLO.  In light of the state court Lockdown Order finding that Plaintiff posed a danger to prosecution witnesses and that Plaintiff should be limited in his communication with others, there is a legitimate governmental interest in monitoring Plaintiff's mail.  Further, Plaintiff's allegation that his legal mail to this Court was censored is insufficient to state a cognizable claim insofar as Plaintiff does not allege he suffered any prejudice by the censorship.  (*See* SAC ¶¶ 48-49.)

In sum, I recommend that Plaintiff's claims of denial of access to the courts be dismissed.  This includes dismissing CO White, as Plaintiff only alleges that CO White informed him that he was not allowed to send any mail outside of the facility.[12]  (*See* SAC ¶ 43).

### 7.  FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

To the extent that Plaintiff asserts a claim for violation of his Fifth Amendment right not to incriminate himself in connection with his handwritten requests for law library materials, it fails as a matter of law.  The privilege against self-incrimination does not protect a defendant

---

[12] Plaintiff also alleges that CO White placed him in enhanced restraints once (SAC ¶ 6) which, as discussed below, is without merit.

from being compelled to provide a handwriting exemplar because such an act is not

testimonial.  *See U.S. v. Greer*, 631 F.3d 608, 612 (2d Cir. 2011) (citing *U.S. v. Hubbell*, 530 U.S.

27 (2000)).  Thus, this claim should be dismissed.

8.  **<u>EXCESSIVE FORCE FROM HANDCUFFS AND ENHANCED RESTRAINTS</u>**

Plaintiff alleges that he was subjected to excessive force in violation of the Fourteenth

Amendment when he was placed in and taken out of enhanced restraints.  For example, he says

on one occasion when removing handcuffs, Defendant Captain Le Fleur bent Plaintiff's wrist

and another time the handcuffs caused severe wrist pain.  (SAC ¶¶ 156, 172.)  To establish a

claim of excessive force, "a pretrial detainee must show only that the force purposely or

knowingly used against him was objectively unreasonable" given the facts and circumstances at

the time.  *Kingsley*, 576 U.S. at 396-97; *Edrei v. Maguire*, 892 F.3d 525, 534 (2d Cir. 2018).

Courts consider several factors when determining objective reasonableness, including: the

relationship between the need for the use of force and the amount of force used; the extent of

the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force;

the severity of the security problem at issue; the threat reasonably perceived by the officer;

and whether the plaintiff was actively resisting.  *Edrei*, 892 F.3d at 534.

Where injuries are *de minimis*, such as pain or abrasions from a handcuffing like that

alleged by Plaintiff here, courts have found the allegations insufficient to give rise to a

constitutional claim of excessive force.  *See Johnson v. City of New York,* 2020 WL 3100197, at

*3 (S.D.N.Y. June 11, 2020) (dismissing plaintiff's unnecessary handcuffing Section1983

excessive force claim where handcuffs caused bruises on plaintiff's left and right wrists, and

numb wrists); *McGarrell v. Arias*, 2019 WL 2528370, at *4 (S.D.N.Y. Mar. 1, 2019), *report and*

*recommendation adopted*, 2019 WL 1254880 (S.D.N.Y. Mar. 19, 2019) ("*De minimis* injuries from handcuffing such as numbness or inflammation are insufficient to sustain an excessive force claim," and "[m]inor cuts from handcuffing do not support an excessive force claim, even if the cuts result in some bleeding.").

In this case, Plaintiff cites no specific injury from the handcuffing other than short-term pain.  (SAC ¶¶ 156, 172.)  No factual details are provided to suggest there was any intent to apply more force than required to attach or remove the restraints.  This is insufficient to state a claim.  Thus, I recommend that the excessive force claim be dismissed.  This includes a recommendation to dismiss Defendant Peters, as Plaintiff only alleges that he took an opportunity to show other officers how to apply enhanced restraints when returning Plaintiff to his unit.  (*See* SAC ¶ 74.)

### 9.   DUE PROCESS CLAIMS RELATED TO REQUIREMENT OF ENHANCED RESTRAINTS

Plaintiff claims that his procedural and substantive due process rights were violated by being designated a CMC inmate and placed in enhanced restraints without a hearing.  The CLO required enhanced restraints whenever he was outside of his cell.  (SAC Ex. 3.)  He was placed in enhanced restraints during legal visits and medical examinations, he was shackled and handcuffed for over five hours while lying on the gurney in the facility clinic when he had a gallbladder attack, and he was handcuffed during recreation.  His complaints implicate his substantive and procedural due process rights under the Fourteenth Amendment, addressed in turn below.

###### a. Fourteenth Amendment Substantive Due Process

"In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law," the Supreme Court held that "the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell*, 441 U.S. at 535. "[I]in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word," courts "must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. The Supreme Court explained that, "in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not 'rationally related to a legitimate nonpunitive governmental purpose' or that the actions 'appear excessive in relation to that purpose.'" *Kingsley*, 576 U.S. at 398 (quoting *Bell*, 441 U.S. at 541-43)); *Edrei*, 892 F.3d at 535. Accidental or negligent harm is not actionable as a constitutional due process claim. *Kingsley*, 576 U.S. at 396.

In *Hunter v. City of New York*, the plaintiff challenged his placement in a segregated housing unit and being subjected to additional restrictions including enhanced security restraints. 2015 WL 5697218, at *1 (S.D.N.Y. Sept. 28, 2015). The court granted summary judgment finding that there was no evidence that any of the conditions, including the enhanced restraints, were intended to punish him or imposed for any purpose other than the prison's legitimate goal of complying with a state court order mandating that Plaintiff be prevented from making phone calls except to his attorney and prevented from writing or directing others to write to the victim of Plaintiff's crime due to Plaintiff's prior harassing conduct toward the

victim.  *Id.* at 9-16.; *see also Brown v. Doe*, 2014 WL 5461815, at *7 (S.D.N.Y. Oct. 28, 2014)

(pretrial detainee failed to state claim for a substantive due process violation when conditions

of confinement imposed were to enforce a court order).

      Because the implementation of the CLO implicates other constitutional protections,

namely the free exercise of religion and access to counsel, as discussed above, the analysis

below focuses on Plaintiff's allegations related to being placed in enhanced restraints, which is

assessed under the Fourteenth Amendment as Plaintiff is a pretrial detainee.  Here, the CLO

imposed security restrictions on all inmates under court ordered lockdown status, including

Plaintiff, and established policy and procedures for the care, custody, and control of those

inmates.  Specific to Plaintiff, the purpose of the Lockdown Order is

> to protect the integrity of the criminal proceedings against
> [Williams] and others and to assure the safety of potential
> witnesses and their families, and its mandate, that Plaintiff be
> housed in the lockdown area, on lock-in, to be separated from all
> other inmates in the area, in such a manner as to prevent him, to
> the extent possible, from communicating with or passing material
> to other inmates[.]

(SAC Ex. 19.)  This Lockdown Order was found necessary by the state court to achieve that

purpose.  Other cases have found that orders similar to the CLO are generally applicable and

not issued to punish a particular detainee and are rationally related to a legitimate

governmental objective of complying with the mandates of orders similar to Williams'

Lockdown Order.  *See e.g., Hunter*, 2015 WL 5697218.

      The Court recognizes that Plaintiff has asserted that CO Ramirez, CO Hickson, Warden

Dunbar, ADW Carter, Captain Blake, CO K. Young, CO Rodriguez, Captain Le Fleur, CO Reid, and

CO McNeil made statements suggesting Plaintiff was subject to the CLO due to his complaints

about prison conditions.  However, the CLO by its terms is generally applicable to individuals

subject to a Lockdown Order issued by the State Court.  Thus, whatever these CO's may have

thought or said does not change the fact that the CLO would not have applied but for the State

Court Lockdown Order.  Thus, their statements are irrelevant to the analysis of the substantive

due process claim, at least to the extent the CLO's mandate of enhanced restraints was

consistent with the goal of the Lockdown Order to prevent communication, including by hand

signals, with others who might assist Plaintiff in harming witnesses.  (*See* SAC ¶¶ 23, 49, 61, 82,

97, 101, 119, 121, 122, 127, 133, 157-58, 161, 163, 167, 170, 190, 203-04, 208-09, 222; SAC p.

104.)

However, to the extent the CLO's mandate is overbroad and inconsistent with the goal

of the Lockdown Order, there may be a valid due process claim.  For example, it is unclear how

placing Plaintiff in enhanced restraints during exercise/recreation, while strapped to a medical

gurney or in a private room with his attorney is necessary to achieve the mandate of the State

Court's Lockdown Order.

"Courts have recognized that some opportunity for exercise must be afforded to

prisoners."  *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (quoting *Anderson v. Coughlin*, 757

F.2d 33, 34–35 (2d Cir. 1985)).  Here, Plaintiff alleges that on November 16, 2020, he was

afforded recreation, but CO Dychese told Plaintiff that if he wanted to go to recreation, he

would have to be handcuffed for the entire recreation period pursuant to the CLO.  (SAC ¶¶

110.)  Courts in this circuit, including the Second Circuit have noted that requiring enhanced

restraints may deprive a prisoner a meaningful opportunity to exercise and that such law is

clearly established.  *See Edwards v. Quiros*, 986 F.3d 187, 192 (2d Cir. 2021) ("we conclude that

there was sufficient evidence for the jury to find that [the warden] had the requisite state of mind for the entire six-month period during which Edwards was required to exercise in restraints when outside of his cell"); *McCray*, 963 F.3d at 120 ("In this Circuit the rights of prisoners to a meaningful opportunity for physical exercise had been clearly established nearly three decades [ago]"); *see also Brown v. Venettozi*, 2021 WL 323264, at *6 (S.D.N.Y. Feb. 1, 2021).  Thus, Plaintiff has plausibly alleged a violation of his rights in regard to the use of enhanced restraints while exercising.  *See Paul v. LaValley*, 712 F. App'x 78, 79 (2d Cir. 2018) ("Accordingly, we have agreed with other Circuits that some opportunity for exercise must be afforded to prisoners, and we have held that this right was clearly established for qualified immunity purposes by no later than 1985[.]") (internal citations and quotation marks omitted). Defendants are not entitled to qualified immunity on Plaintiff's meaningful exercise claim because there is clearly established law that placing an inmate in enhanced restraints during exercises infringes on the right to meaningful exercise.  *See Edwards*, 986 F.3d at 195 ("The jury reasonably determined, upon sufficient evidence, that Quiros knowingly violated Edwards's clearly established right to meaningful exercise under the circumstances and lacked a sufficient justification for doing so.  We will not disturb the jury's finding that Quiros was not entitled to qualified immunity.").

        While Plaintiff's allegations that he was placed in enhanced restraints while in a private room with his attorney and while strapped to a medical gurney raise a plausible claim that the restraints were excessive for their purpose, Defendants are entitled to qualified immunity with regard to their use of enhanced restraints in these circumstances because there is no clearly

established law that an inmate under a Lockdown Order may not be placed in restraints during

meetings with an attorney or receiving medical care.  *See Lennon*, 66 F.3d at 416.

Accordingly, I recommend that the motion to dismiss the substantive due process claim

be denied as to requiring enhanced restraints while exercising.

### b. Fourteenth Amendment Procedural Due Process

To the extent that Plaintiff asserts a liberty interest in not being classified as a CMC

inmate, such a claim warrants dismissal because no liberty interest exists in avoiding prison

classification.  *See Pugliese v. Nelson*, 617 F.2d 916, 925 (2d Cir. 1980) ("[J]udicial intervention

into the classification of prisoners for monitoring and control purposes would almost inevitably

involve the federal courts in the day-to-day operations of our prison system, which are better

left to the expertise of prison administration authorities"); *see also Hunter*, 2015 WL 5697218,

at *12 (collecting cases).

However, this does not end the inquiry as to whether Plaintiff was entitled to some

procedural due process prior to being designated for placement in enhanced restraints.  The

level of procedural protection required differs according to the purpose of the confinement.

*Benjamin*, 264 F.3d at 190.  If the restraint is imposed for disciplinary reasons, a prisoner must

be provided written notice, adequate time to prepare a defense, a limited ability to present

witnesses and evidence, and a written statement of the reasons for the discipline*.  Id.* (citing

*Wolff v. McDonnell*, 418 U.S. 539, 561-70 (1974)).  If the restraint is for administrative purposes

such as to mitigate a security threat or to segregate pending a completion of a misconduct

investigation, an inmate "must merely receive some notice of the charges against him and an

opportunity to present his views."  *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460, 476 (1983)); *see*

*also Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (administrative segregation is

permitted if necessary to incapacitate a detainee who poses a security threat or to investigate

misconduct).

Prison officials also must conduct periodic reviews to determine whether an individual

remains a security risk warranting the liberty restriction—a case-by-case factual assessment

coupled with the prison conditions and tensions at the time. *Parson v. Miller*, 2018 WL

4233810, at *5 (N.D.N.Y. May 25, 2018), *report and recommendation adopted*, 2018 WL

4228427 (N.D.N.Y. Sept. 5, 2018).  Prison officials are accorded substantial deference in the

adoption of policies and procedures to ensure institutional security.  *Proctor*, 846 F.3d at 610.

The purpose of the CLO is to comply with the State Court Lockdown Order, which is not

disciplinary or purely administrative.  (SAC Ex. 3.)  This Court was unable to identify any

Supreme Court or Circuit case setting forth the procedure for assessing or re-assessing

restrictions imposed to implement a court order.  A detainee could of course challenge a State

Court order issued in his underlying criminal case through his defense attorney and notify the

prison if and when the State Court order is lifted, at which time the prison presumably would

cease subjecting the detainee to the internal prison procedures implemented solely to enforce

the State Court order.  But, to the extent a prison order was issued to implement a Court Order,

the prison order presumably would remain in effect without review until the Court Order is

lifted or modified.  A prison could afford a hearing in advance of subjecting a detainee to such

an order so that the detainee could challenge its scope to the extent it exceeded the dictates of

the State Court order; however, the detainee could also go back to the state judge who issued

the order to seek clarification of the restrictions required.  Again, this Court could find no cases on point.

Since no clearly established law exists establishing that a pretrial detainee, such as Plaintiff, has a right to a hearing prior to or after imposition of enhanced restraints implemented purportedly for purposes of implementing a court-issued Lockdown Oder, the individual Defendants Louis, Captain Moodie, Captain Merenych are entitled to qualified immunity on the Plaintiff's claim of violation of the procedural Due Process Clause of the Fourteenth Amendment.  *See Wills v. Microgenics Corp.*, 2021 WL 3516419, at *5 (E.D.N.Y. Aug. 10, 2021) (finding defendants were entitled to qualified immunity because former inmate's due process claim was not clearly established).  Accordingly, dismissal of this claim is warranted.

### 10. FIRST AMENDMENT RETALIATION

Plaintiff asserts that, since his transfer to GRVC, he has been subjected to Defendants' retaliatory conduct.  Defendants stated to Plaintiff, on numerous occasions, that his mistreatment at GRVC was due to his lawsuit against Captain Mathis and complaints he made since his arrival at GRVC.  (SAC ¶¶ 23, 49.)

"[I]t is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'"  *Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996)).  A plaintiff asserting First Amendment retaliation claims must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Id.*

(quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)).  The filing of a prison grievance is

protected activity.  *Id*.  To constitute an adverse action, the retaliatory conduct has to be of a

nature that it would "deter a similarly situated individual of ordinary firmness from exercising

his or her constitutional rights[.]"  *Davis*, 320 F.3d at 353 (quoting *Dawes v. Walker*, 239 F.3d

489, 491 (2d Cir.2001)).

"[T]o satisfy the causation requirement, allegations must be sufficient to support the

inference that the speech played a substantial part in the adverse action."  *Id.* at 354 (cleaned

up).  When determining a causal connection, courts may infer a retaliatory motive in the

adverse action from: (1) "the temporal proximity of the filing to the grievance and the

disciplinary action"; (2) "the inmate's prior good disciplinary record"; (3) "vindication at a

hearing on the matter"; and (4) "statements by the defendant regarding his motive for

disciplining the plaintiff."  *Thomas v. DeCastro*, 2019 WL 1428365, at *9 (S.D.N.Y. Mar. 29, 2019)

(quoting *Barnes v. Harling*, 368 F. Supp. 3d 573, 600 (W.D.N.Y. 2019)); *see also Espina*, 558 F.3d

at 129.

Defendants did not make any specific argument for dismissal of Plaintiff's First

Amendment retaliation claim, which is aimed at Defendants CO Ramirez, CO Hickson, Warden

Dunbar, ADW Carter, Captain Blake, CO K. Young, CO Rodriguez, Captain Le Fleur, CO Reid, CO

McNeil, and Captain Mathis.  (SAC ¶¶ 6, 12-23, 49, 82, 89, 97, 101, 119, 127, 133, 157-58, 161,

163, 167, 170, 186, 190, 199, 203-04, 208-09, 222.)  Further, the allegations are sufficient at this

stage to raise a plausible claim of retaliation given the statements allegedly made suggesting

that Plaintiff was denied religious accommodations and other deprivations because of filing

lawsuits and grievances.  Thus, the motion should be denied as to this claim.

59

11. **MUNICIPAL LIABILITY**

A municipality cannot be held liable under Section 1983 under a respondeat superior theory. *City of Canton v. Harris*, 489 U.S. 378, 392 (1989).  Rather, it can be liable only if the constitutional violations are caused by execution of a government policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy[.]" *Monell*, 436 U.S. at 691, 694.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  A plaintiff may demonstrate that such a policy or custom exists by introducing evidence of one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester County*, 182 F. Supp.3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon v. City of New York*, 705 F. Supp.2d 261, 276-77 (S.D.N.Y. 2010)).

When alleging an affirmative municipal policy, "a plaintiff must make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policymaking authority for the municipality."  *Missel v. County of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009).  The action of a single decisionmaker who has final

authority may be sufficient to support *Monell* liability.  *Montero v. City of Yonkers*, 890 F.3d

386, 403 (2d Cir. 2018).  To determine whether an official has final decisionmaking authority,

the official need not be a policymaker for all purposes, rather, "with respect to the conduct

challenged, he must be responsible under state law for making policy in that area of the

municipality's business."  *Graham v. City of New York*, 2009 WL 909620, at *2 (E.D.N.Y. Mar. 31,

2009) (quoting *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir.2000)) (internal quotation marks and

alterations omitted).  Courts have noted that it is often unclear whether wardens may be

policymaker to support a *Monell* claim.  *See Id.* (denying summary judgment and noting it is

unclear whether Warden Curcio is a policymaker under state law); *Pembaur v. City of Cincinnati*,

475 U.S. 469, 483 n.12 (1986) (plurality opinion) (noting in dicta that a county sheriff, for

example, may serve as an official policymaker for municipal-liability purposes with respect to

some actions but not others); *Elliott v. Mgmt. & Training Corp.*, 2017 WL 3089693, at *7 (N.D.

Miss. July 19, 2017) (accepting on summary judgment that the warden may be an official

policymaker); *Sugamosto v. Emerald Corr. Mgmt., LLC*, 2013 WL 12333651, at *3 (D.N.M. Feb.

13, 2013) (denying motion to dismiss because plaintiff sufficiently alleged that the warden

possessed the authority to craft official prison policy requiring that plaintiff be shackled).

　　　To prevail on a *Monell* claim, a plaintiff must also show that "there is a direct causal link

between [the] municipal policy or custom and the alleged constitutional deprivation" he

suffered.  *City of Canton*, 489 U.S. at 385.  "When a municipality chooses a course of action

tailored to a particular situation, this may also represent an act of official government policy as

that term is commonly understood."  *Montero*, 890 F.3d at 403 (citing *Amnesty Am. v. Town of

W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004)) (internal quotation marks omitted).

At this stage of the litigation, it is premature to definitively determine whether Warden Dunbar is a final decisionmaker to support municipal liability, thus dismissal is unwarranted. Here, Plaintiff alleges and provides documentation that Warden Dunbar drafted and enforced the CLO, a course of action supposedly tailored to the State Court Lockdown Order.  (*See* SAC ¶ 168; SAC Ex. 3.)  To the extent the CLO is overbroad and not tailored for the purpose of implementing the Lockdown Order, there is a plausible *Monell* claim.  For example, the Lockdown Order says nothing about restricting access to religious texts, yet the CLO restricts Plaintiff and other inmates to a Bible (rather than a religious text corresponding to the inmate's religion).  The SAC demonstrates that the CLO's restrictions were read literally.  Plaintiff alleges that he was told that a Torah would not be provided to him because the CLO only permitted him to have a Bible.  (*See* SAC ¶¶ 38, 67, 215.)  Similarly, the Lockdown Order did not specifically mandate enhanced restraints during exercise.  Insofar as the Second Circuit has indicated that enhanced restraints during recreation time may unconstitutionally burden a detainees's right to engage in meaningful exercise, the CLO was overbroad.  Thus, a plausible *Monell* claim is stated as to this aspect of the CLO as well.

The same is not true for Plaintiff's claim that his Fourteenth Amendment rights were violated when he was placed in enhanced restraints during his medical treatment and legal visit under a deliberate indifference theory.  The individual Defendants are alleged to have construed the CLO as mandating enhanced restraints in these circumstances, even though the CLO does not expressly state this (in contrast to mandating enhanced restraints for exercise).  Thus, it is unclear whether the CLO was intended to cover these circumstances.  The applicable *Monell* theory here would be that the Warden was deliberately indifferent to the manner in

which individual officers were implementing the CLO.  "To establish deliberate indifference a

plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of

constitutional injury, but failed to take appropriate action to prevent or sanction violations of

constitutional rights."  *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012).  Here,

Plaintiff does not allege that any policymaker (i.e., Warden Dunbar) was actually aware that

subordinates were enforcing the CLO to require enhanced restraints while in a private meeting

with an attorney or while on a hospital gurney.  He only alleges that correctional officers told

him they were following orders as provided in the CLO.  (*See* SAC ¶¶ 61, 71, 218.)  Personal

knowledge cannot be imputed to Warden Dunbar because the CLO does not explicitly state that

prisoners should be handcuffed when receiving medical attention or consulting their attorneys.

Thus, Plaintiff has not plausibly alleged that Dunbar was deliberately indifferent and failed to

take appropriate corrective action.  The same cannot be said for Plaintiff's claim concerning his

right to exercise because the CLO clearly states "inmates will be restrained in waist chains[,]

handcuffs[,] and mitts whenever they are out of their cells for recreation."  (SAC Ex. 3.)  In other

words, Dunbar wrote the CLO with that restriction and had knowledge of it notwithstanding

applicable case law stating that such restraints constitute an infringement of the right to

meaningfully exercise.

Accordingly, I recommend denying Defendants' motion to dismiss Plaintiff's municipal

liability claim with respect to the equal protection claims relating to the provision of religious

texts and being placed in enhanced restraints when exercising.  To the extent Plaintiff is raising

other municipal liability claims, I recommend that those claims be dismissed for failure to state

a claim because the other practices about which Plaintiff claims do not stem from any official

policy and the allegations do not otherwise plausibly demonstrate widespread violations of

Constitutional rights sanctioned by policymakers or resulting from a lack of training.  This

results in the dismissal of Defendant Omiblu who is only mentioned in claims related to *Monell*

and negligent hiring.  (*See* SAC pp. 117, 124.)

### 12. NEGLIGENT HIRING, RETENTION, TRAINING AND SUPERVISION

In addition to constitutional claims, Plaintiff asserts state law negligent hiring, retention,

training, and supervision claims.  To state such a claim, a plaintiff must first demonstrate an

employee was negligent.  *Mena v. City of New York*, 2019 WL 1900334, at *5 (S.D.N.Y. Apr. 29,

2019).  Once this is established, a plaintiff must allege:

> (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (cleaned up).  In addition, "a claim

for negligent hiring or retention cannot proceed against an employer for conduct of an

employee acting within the scope of employment."  *Id.*; *Mena*, 2019 WL 1900334, at *6; *De'Bey

v. City of New York*, 2022 WL 909790, at *8 (S.D.N.Y. Mar. 29, 2022).

Here, Plaintiff does not allege that the Defendants acted outside of the scope of their

employment; rather, he alleges that Defendants stated to him repeatedly that their actions

were based on CLO 370.20 and the restrictions contained therein.  Given that Plaintiff does not

allege that Defendants acted outside of the scope of their employment, no basis exists for his

negligent hiring, retention, training, and supervision claims under New York law.  Hence, I

recommend that these claims be dismissed.

### 13. FALSE IMPRISONMENT

To the extent that Plaintiff attempts to assert a false imprisonment claim, its dismissal is warranted because Plaintiff is confined pursuant to the Lockdown Order. *Holmberg v. County of Albany*, 738 N.Y.S.2d 701, 703 (3d Dep't 2002) ("Generally, where a facially valid order issued by a court with proper jurisdiction directs confinement, that confinement is privileged and everyone connected with the matter is protected from liability for false imprisonment.") (citation omitted).

### 14. PERSONAL INVOLVEMENT

Defendants seek dismissal of Plaintiff's allegations as to Defendants Grossman, Jennings, Rene, Stukes, and Scott because they are not alleged to have personally engaged in any deprivation of Plaintiff's constitutional rights and/or the allegations are conclusory or based on hearsay.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.1991)).

> [T]here is no special rule for supervisory liability.  Instead, a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.  The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary.  The violation must be established against the supervisory official directly.

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal citations and quotations omitted).

### a. *Grossman and Jennings*

Plaintiff alleges that Grossman and Jennings had knowledge of the BOC's recommendations concerning Plaintiff's access to the law library (SAC ¶ 45; No. ECF 36.2, p. 14, SAC p. 69), but failed to ensure that violations of the Lockdown Order listed in the BOC's recommendation do not continue (ECF No. 36-2, p. 26-27, SAC p. 80-81).  When Grossman, who was responsible for reviewing complaints (ECF No. 36-2, p. 9, SAC p. 64), was notified by Plaintiff's attorney about the way Plaintiff was treated (SAC ¶ 229), she "responded back acknowledging the complaint from the Plaintiff's attorney and informing her that her department was not the correct department to take complaints of this nature [and] that the plaintiff could file a grievance if he believed he was being mistreated."  (SAC ¶ 230).

Grossman and Jennings were not required to adopt the BOC's recommendations.  *See Legal Aid Soc.,* 91 A.D.2d at 533.  Thus, no basis for liability exists based on their failure to adhere to the recommendations.  Further, Plaintiff's conclusory allegation that Grossman failed to ensure that violations of the Lockdown Order listed in that recommendation do not continue, without more, is insufficient to state a claim against Grossman.  Plaintiff also fails to articulate the basis for his claim that Grossman's response to his attorney violated his constitutional rights.

Thus, dismissing claims against Grossman and Jennings for lack of personal involvement is warranted.

### b. *Rene*

Plaintiff alleges that Warden Rene: (1) "was well aware of the fact that Correctional Personnel around the facility were continuing to wrongfully place the plaintiff in enhanced

restraint" and "that the facility was willing to use force against plaintiff to enforce [the wrong]

pedigree" (SAC ¶ 208); (2) failed "to correct the issue of plaintiff['s] phone time being restricted

to twice a day when his supreme court lockdown order did not list a restriction in how many

times a day that [he] could contact his attorney" (ECF No. 36-3, p. 4, SAC p. 88); (3) failed to

respond to his appeal concerning Plaintiff's refusal to attend the December 7, 2020 hearing

(SAC ¶¶ 191-192); and (4) failed to properly investigate Plaintiff's grievances involving the

Wardens (ECF No. 36-3, p.5, SAC p. 89).

Plaintiff's conclusory allegations that Warden Rene failed to correct the restrictions

imposed by CLO 370.20 and the use of force against Plaintiff to enforce his classification, and to

investigate properly Plaintiff's grievances are insufficient to show *how* Warden Rene's

individual actions violated Plaintiff's constitutional rights.  Further, Warden Rene's failure to

respond to Plaintiff's appeal is not a basis for a constitutional claim under Section 1983.  *See*

*Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do

not confer any substantive right upon an inmate requiring the procedural protections

envisioned by the Fourteenth Amendment.").  Thus, dismissing Plaintiff's claims against Warden

Rene for lack of personal involvement is warranted.

### c. *Stukes and Scott*

The conspiracy claims against Stukes and Scott were dismissed prior to the instant

motion.  With regard to his Section 1983 claim, Plaintiff asserts that in connection with the

November 29, 2020 search of his cell, "Warden Dunbar and Chief Stukes manipulated the

situation so they could utilize Emergency Services Unit ("ESU") (Department of Corrections

Personnel) against the Plaintiff in efforts of advancing their own personal agenda."  (SAC ¶ 166.)

Plaintiff does not state how Stukes "manipulated the situation" or what right was violated by the search of his cell, which was mandated by the CLO.  This is not sufficient to plead Stukes' personal involvement in a violation of Plaintiff's rights.

Similarly, as to Defendant Scott, Plaintiff's allegations are conclusory, fail to show personal involvement, and the alleged actions do not rise to any constitutional violation. Plaintiff alleges that Defendant Scott ordered that he be transferred to GRVC by ESU rather than the transportation division (SAC p. 80), and that other correction officers told Plaintiff that Scott had their back (SAC ¶¶ 73, 190).  Thus, dismissing Plaintiff's claims against Stukes and Scott for lack of personal involvement is warranted.

### 15. OPPORTUNITY TO AMEND

Plaintiff has now had two opportunities to amend his pleadings.  While the Court is sympathetic to the concerns he has raised, nothing in his SAC (or his opposition papers) suggests that he possesses additional facts that would cure the deficiencies described in this Report and Recommendation.  Therefore, I recommend that at this juncture the deficient claims be dismissed with prejudice.  *See, e.g.*, *Palompelli v. Smith*, 2022 WL 624421, at *6 (dismissing *pro se* plaintiff's complaint with prejudice when there was no suggestion that plaintiff possessed facts that would cure deficiencies in previous complaints) (collecting cases); *Dash v. Mayers*, 2020 WL 1946303, at *9 (S.D.N.Y. Apr. 23, 2020) (dismissing complaint with prejudice when plaintiff already had one opportunity to amend complaint and court liberally construed opposition in a way that effectively amounted to another pleading).

## CONCLUSION

For the foregoing reasons, I recommend granting the motion to dismiss (ECF No. 73) as to all claims **except** the claims based on: (1) the First Amendment Free Exercise of Religion Clause against Defendants Carter, Vallejo, Dunbar, Blake, Hickson and Sherman; (2) RLUIPA against Defendants Carter, Vallejo, Dunbar, Blake, Hickson and Sherman; (3) the Fourteenth Amendment Equal Protection Clause against Defendant Dunbar; (4) the Sixth Amendment claim in connection with lack of confidentiality in communication with attorneys against Defendants McNeil, Ritter, Hickson and Carter; (5) the Fourteenth Amendment Due Process deliberate indifference to serious medical needs against prison officials in connection with smoke inhalation and gallbladder attacks against Defendants Coulthurst, Graves, Day and Palmer-Campbell; (6) the Fourteenth Amendment Due Process conditions of confinement in connection with being placed in enhanced restraints during exercise against Dychese and Dunbar; (7) the First Amendment retaliation against Defendants Ramirez, Hickson, Dunbar, Carter, Blake, K. Young, Rodriguez, Le Fleur, Reid, and McNeil; and (8) the municipal liability claim as to Defendants City of New York and Dunbar with regard to the policy restriction on provision of religious texts other than Bibles and being placed in enhanced restraints during recreation.

Given the length of this report and recommendation and to avoid any confusion, as noted above, I recommend that the following Defendants be dismissed from the action:

| | | |
|---|---|---|
| • Peters | • Quinnones | • Captain Merenych |
| • Shivaj | • Emebu | • Grossman |
| • Smith | • Drumwright | • Jennings |
| • Islam | • Dr. Gemo | • Rene |
| • Taylor | • Nezma | • Stukes |
| • Loiseau | • Louis | • Scott |
| • White | • Shoclink | |
| • Omiblu | • Captain Moodie | |

**The Clerk of Court is directed to mail a copy of this Report and Recommendation to Plaintiff.**

Date:  August 5, 2022                              Respectfully submitted,
       New York, New York

KATHARINE H. PARKER
United States Magistrate Judge

**NOTICE**

**Plaintiff shall have seventeen days, and Defendants shall have fourteen days, from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).  A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P. 72(b)(2).**

**Plaintiff shall have seventeen days to serve and file any response.  Defendants shall have fourteen days to serve and file any response.  Any objections and any responses to such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul G. Gardephe at the United States Courthouse, 40 Foley Square, New York, New York 10007, and served on the other parties.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Gardephe.  The failure to file timely objections shall result in a waiver of those objections for purposes of appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).**